**Ronald Wayne FRYE, Petitioner,**

v.

**R.C. LEE, Warden, Central Prison, Raleigh, North Carolina, Respondent.**

**No. CIV.5:99CV108.**

United States District Court, W.D. North Carolina, Statesville Division.

March 9, 2000.

William F. Massengale and Marilyn G. Ozer, Chapel Hill, NC, for Petitioner.

Edwin W. Welch, N.C. Department of Justice, Raleigh, NC, for Respondent.

## MEMORANDUM OF OPINION

THORNBURG, District Judge.

THIS MATTER is before the Court on the Petitioner's petition for a *writ of habeas corpus* pursuant to 28 U.S.C. § 2254. Both parties have filed motions for summary judgment and submitted portions of the record for review as well as legal briefs. Respondent has also filed a response to the petition. The undersigned concludes the record is adequate and finds an evidentiary hearing is unnecessary. Rule 8(a), Rules Governing Section 2254 Cases in the United States District Courts. For the reasons stated herein, the petition is denied.

## I. FACTUAL BACKGROUND

The facts are taken from the North Carolina Supreme Court decision in *State v. Frye*, 341 N.C. 470, 461 S.E.2d 664 (1995), and the trial transcripts submitted by the parties. Leroy Childress testified that his brother, Ralph, owned a trailer which was leased to the Petitioner. From time to time, Petitioner could not pay the rent and Ralph occasionally allowed him to perform work in lieu of rent. However, Ralph had been trying to evict Petitioner for about three months prior to his murder in the early morning hours of Sunday, January 24, 1993.

Leroy also testified that he had spent the day before the murder with his brother who wrote two notes ordering the Petitioner to vacate the trailer. Leroy affixed one note to the front door of the trailer and the other to the back door. Leroy said his brother was known to carry a large sum of money in cash, typically $5,000 in $100 bills.

At about 2:00 a.m. on January 24, Ralph called his brother and told him the Petitioner had been at his house trying to sell him a couch. During the conversation, Ralph relayed to his brother that he told Petitioner to vacate the trailer and Petitioner agreed to do so the next day. Ralph and Leroy made plans to meet for breakfast the next morning.

On Sunday morning, Leroy called his brother, but there was no answer. Finding this strange, Leroy rushed to his brother's home around 8:00 a.m. and found Ralph lying on the floor with a pair of scissors embedded in his chest. When the police arrived, they found a bloody wallet without any money in it between Ralph's legs. There was no sign of a forced entry;

however, the living room furniture had been knocked over. A .38 revolver was found under a cushion behind a footstool and a bloody knife blade was found under the cushion of an easy chair. A small file box next to that chair had been opened and contained a latent fingerprint.

The light in Ralph's bedroom was on and the bed clothes had been pulled back revealing a blood smear on the mattress. The cord to the telephone had been pulled out from the wall. Desk drawers were open and clothes were strewn about the bedroom. A pair of bloodstained khaki pants was also in the bedroom.

Bloodstains were prominent around the kitchen sink, including the faucet handles. A Derringer .22 caliber pistol lying on the kitchen table had blood on its handle. Leroy testified that both guns were owned by his brother, but Ralph did not keep the .38 revolver loaded. When Leroy returned later to clean his brother's home, he found in the bedroom one of the two eviction notices which he had attached to the Petitioner's trailer the day before.

Dr. Joseph Vogel performed the autopsy on Ralph's body. The stab wound to his chest was the cause of death because the scissors penetrated his aorta; Ralph in essence bled to death. He also had five other wounds to the neck and chest areas. He had two neck wounds which would have been inflicted by a knife blade or scissors. One penetrated to the bone under the chin, but both could have been inflicted before the fatal chest wound. The doctor testified there was no indication that Ralph lost consciousness before his death.

Michael Ramseur testified he had sold crack cocaine to the Petitioner on numerous occasions. On a Saturday morning in January 1993, Petitioner tried to sell Ramseur personal property in exchange for crack. Petitioner told Ramseur that he knew he could get money out of "that landlord" and suggested that Ramseur rob the man since Petitioner would be recognized. Ramseur refused. However, the next day Petitioner returned to buy crack and had a roll of money which included five or six $100 bills.

Petitioner's cousin, Kenneth Berry, lived next door to him. He testified that Petitioner came to his house sometime between 11:30 p.m. on Saturday, January 23, and 1:00 a.m. on Sunday, January 24. Petitioner was drunk and tried to sell Berry his army jacket in order to get money. Berry sent him away. Berry did not see any cuts on the Petitioner's hand.

Around 8:30 a.m. on January 24, Petitioner visited Doug Propst and repaid him $100. While the two were smoking crack, Petitioner laid out a large number of $100 bills on a counter. Franki Bryson also saw the Petitioner on a Sunday morning in January. Petitioner asked her to buy drugs for him and gave her $100 bills for the purchase. She testified that the Petitioner's hand had been cut.

Kevin Templeton testified the Petitioner told him about the robbery. Petitioner said he had only meant it to be a robbery but had "got carried away." Petitioner also told Templeton he had gotten almost $5,000 in the robbery.

Testimony was taken from a serologist at the trial. North Carolina State Bureau of Investigation (SBI) Special Agent Elwell testified that blood on the knife handle, the Derringer pistol, mattress, Petitioner's army jacket and blue jeans was consistent with Petitioner's blood. Blood from the khaki pants, knife blade and left sleeve of the Petitioner's jacket was consistent with Ralph's blood. SBI Agent Boodee analyzed the DNA content of the evidence received from Agent Elwell. The bloodstains from the knife blade and the army jacket matched samples taken from Ralph. The bloodstain from the mattress matched the blood sample taken from the Petitioner.

The jury found the Petitioner guilty of first degree murder on the basis of premeditation, deliberation and malice and on the basis of the felony murder rule. He was also found guilty of robbery with a

dangerous weapon. During the sentencing phase of the trial, the State presented no additional evidence. Petitioner's attorneys called the chief jailer at Catawba County Jail where the Petitioner had been incarcerated for nine months prior to trial. He testified the Petitioner had caused no problems, had been in jail previously and had demonstrated an ability to conform to prison life.

Dr. Jerry Noble was retained by defense counsel as an expert clinical and forensic psychologist. Dr. Noble conducted testing on the Petitioner and interviewed him four to five times. He reviewed the Petitioner's medical records from Dorothea Dix Hospital as well as investigative reports. He described the Petitioner as a quiet and friendly person who made no excuses. Sentencing Transcript, dated November 1, 1993, at 11–12.[1] When asked difficult questions about his life, he answered in a matter-of-fact manner without showing emotion. *Id.* This is often the case with adults who were abused as children. *Id.* Petitioner told the doctor about his family and background. His mother, whom he did not meet until he was 11 years old, turned he and his brothers over to foster care. *Id.,* at 13. From the ages of two until eight, Petitioner was in foster care where he was severely physically abused by the foster father. *Id.,* at 14. He remembered being whipped the first day he arrived in their care and was repeatedly whipped by his foster father with a bull whip. *Id.* On one occasion, the foster father required Petitioner and his brother to bullwhip each other while he watched. *Id.* He also forced the brothers to fight each other while he watched. *Id.* Petitioner recalled being pulled from sleep and bull-whipped. *Id.,* at 15. In addition to such sadistic behavior, the foster father, who drank, sometimes made the Petitioner eat food from the floor. *Id.* He was abnormally strict and on one Christmas did not provide the children with any presents. *Id.*

When school authorities noticed the Petitioner's wounds and scars from the bull-whip, he and his brother were removed from this home and placed in an orphanage. The foster parents were criminally charged. Petitioner then had sporadic times when he lived with one or the other of his biological parents. *Id.,* at 16. However, he never lived with either parent long enough to establish bonding. *Id.* As a result, in addition to being severely physically and psychologically abused, Petitioner received no nurturing and thus was unable to form normal attachments to people. *Id.,* at 25. Yet, Petitioner did tell Dr. Noble that sometimes when he watched television programs he would become sad and cry uncontrollably. *Id.,* at 17–18. This occurred because the program often involved close family relationships which he had never experienced. *Id.* Dr. Noble described this as a "bind" for the Petitioner because although he craved relationships, he was afraid of people. *Id.,* at 25.

Petitioner had average grades but dropped out of high school shortly before graduation as the result of a disagreement with his mother. She insisted he work during the time when he was to play on the high school baseball team. *Id.,* at 19. As a result, he simply dropped out of school and never completed his formal education. *Id.*

Petitioner was hospitalized for some time when he was two years old as a result of ingesting kerosine. *Id.* He had been in several automobile accidents, one of which resulted in a period of unconsciousness. *Id.,* at 20. He also had a history of migraine headaches during youth and continued to have high blood pressure. *Id.* He had permanent scarring from the whippings. *Id.* Although Petitioner admitted using alcohol and crack cocaine, he minimized his addiction problems. *Id.,* at 21.

Dr. Noble testified that in the year prior to this incident, Petitioner had been using

---

1. The Court has not made specific references to the record until this point because the Petitioner does not dispute, in this petition, the trial facts. Petitioner's assignments of error are limited to the sentencing phase of the trial.

drugs and alcohol heavily and this substance abuse elevated his pre-existing chronic paranoia disorder. *Id.*, at 23. He thought people in general would like to see harm come to him. *Id.* However, Petitioner described Ralph as a fine man and a friend. *Id.*, at 24. Sometimes he and Ralph watched television together. *Id.* Ralph occasionally loaned him money or let his rent go for awhile. *Id.*, at 26. Petitioner became dependent on him and thought of him as safe because Ralph was tolerant of him and responded to his needs such as allowing extensions on the rent. *Id.*, at 26–27. Over time, Ralph had become a father figure to the Petitioner; not in the traditional sense, but in the manner that an adult who had been severely abused as a child might think of a father. *Id.* Petitioner's attachment to Ralph and his drug addiction caused their relationship to be emotionally charged. *Id.*, at 28.

Petitioner was diagnosed by Dr. Noble with three psychiatric disorders: paranoia; mixed substance abuse and mixed personalty disorder. *Id.*, at 33–34. Petitioner also had child abuse syndrome as a result of the extreme physical abuse he had sustained. *Id.* Dr. Noble opined the defendant had diminished capacity to know right from wrong and to conform his behavior to social norms. *Id.*, at 35. He described Petitioner as a "type H" offender, one frequently thought of as insane and requiring anti-psychotic medication. *Id.*, at 30. Petitioner suffered from persecution delusions and believed he had premonitions. *Id.*, at 31. He also suffered from significant memory problems. His personality disorder was best described by stating that he is paranoid but also avoidant; that is, he is a loner but craves contact with people. *Id.*, at 34. Yet he is unable to seek out and maintain relationships. *Id.* Due to all these problems, Dr. Noble opined that Petitioner had expressed both guilt and remorse although not in a traditional manner. *Id.*, at 36. Although he could not directly admit wrongdoing due to his severe abuse as a child, he was remorseful and nostalgic about Ralph. *Id.* His substance abuse had further diminished his capacity to know right from wrong. *Id.*, at 37. At the time of the murder, Petitioner had been abusing cocaine and alcohol for over 20 years. *Id.*, at 38–39. At the time of the murder, his behavior was fueled by psychosis and intoxication, including paranoid distortions. *Id.*, at 45. He had compulsive behaviors coupled with a diminished capacity to control his impulses. *Id.*

Dr. Noble was not able to speak with Petitioner's mother or other family members because Petitioner refused to give him permission to do so. *Id.*, at 39. "He expressed a desire to me not to involve his family in these circumstances." *Id.* Petitioner had paranoid delusions that if his family were questioned, or even attended the trial, they would be subjected to retaliation. *Id.*, at 49. As a result, he insisted they not attend the trial and not be involved. *Id.* This protective but paranoid concern was especially strong for his brother due to the abuse they had suffered together as children. *Id.* ("[H]e was not willing to tolerate them in the courtroom and deal with his fear that they would somehow be retaliated against, and so rather than tolerate that fear his policy was he was asking them not to come. And, ... I view that with consistency with paranoid pathology.").

Petitioner's trial counsel argued that mitigating factors outweighed aggravating factors and urged the jury to return a verdict of life imprisonment. The jury found the following mitigating factors:

1. The capital felony was committed while the Petitioner was under the influence of mental or emotional disturbance;

2. The capacity of the Petitioner to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired;

3. The Petitioner suffered from an alcohol condition at the time of the offense;

4. The Petitioner suffered from a drug abuse condition at the time of the offense;

5. The Petitioner did not have the benefit of treatment or counseling for alcohol abuse;

6. The Petitioner did not have the benefit of treatment for drug abuse;

7. The Petitioner from an early age was a ward of the Department of Social Services;

8. Petitioner did not know his mother until he was 11 years old;

9. Petitioner did not know his father until he was 8 years old;

10. Petitioner never had a responsible adult male role model to guide him in his behavior;

11. Petitioner's father was married several times and never provided a stable home environment for the Petitioner;

12. Petitioner was deprived of companionship, leadership and role model in the person of his father at a critical time in his life;

13. Petitioner's father was significantly absent from Petitioner's life during his developmental years;

14. Petitioner's father was not a proper role model and offered no guidance to his young son;

15. Petitioner's mother provided no guidance to her young son during his childhood;

16. Petitioner was abused by his foster father and others during his childhood;

17. Petitioner suffered from a paranoid disorder;

18. Petitioner was a person in chronic emotional pain and used drugs to make him feel better;

19. Petitioner suffered from a mixed personality disorder;

20. Petitioner was a victim of child abuse syndrome;

21. Petitioner did not want to die; he wanted to live, even if incarcerated in prison under a life sentence;

22. After 8 years of age, Petitioner was raised in an orphanage;

23. Petitioner was whipped repeatedly by his foster father with a bullwhip;

24. Petitioner was made to whip his brother and was himself whipped by his brother;

25. Petitioner was made to eat food off of the floor under the kitchen table;

26. Petitioner was "grounded" for as long as six weeks at a time while in foster care;

27. Petitioner never bonded with either of his biological parents;

28. Petitioner desired a normal life as reflected by situation comedies shown on television;

29. Petitioner suffered from tension headaches in his youth due to stress;

30. Petitioner presently suffered from migraine headaches;

31. Petitioner had been an alcohol abuser since his teens;

32. Petitioner had been a drug abuser since his teens;

33. Due to his previous use of crack cocaine, the Petitioner was acting under a compulsion at the time of the incident;

34. Petitioner had a diminished capacity to conform his behavior to social norms at the time of the offense.

*Id.*, at 112–117; Sentencing Issues and Recommendation as to Punishment.

Despite the finding of a significant number of mitigating factors, the jury did not unanimously find that the mitigating factors outweighed the aggravating factors and the death penalty was imposed. *Id.*, at 126. The conviction and sentence were affirmed on direct appeal.[2]

**2.** The United States Supreme Court denied the petition for a *writ of certiorari* in April

1996. *Frye v. North Carolina*, 517 U.S. 1123, 116 S.Ct. 1359, 134 L.Ed.2d 526 (1996).

Petitioner's current attorneys subsequently filed a motion for appropriate relief in which it was claimed that trial counsel were ineffective during the sentencing phase of the trial and Petitioner was incompetent to participate in the sentencing phase. Superior Court Judge Forrest A. Ferrell conducted a hearing on the motion which took almost a full week.

Petitioner again called Dr. Noble as an expert witness. The doctor reiterated Petitioner's instructions not to involve his family and testified that as a result, "clearly there had been a narrow body of information gleaned because those efforts had been influenced by Mr. Frye's wishes." Transcript of Hearing on Motion for Appropriate Relief, at 135 [Hearing Transcript]. However, Dr. Noble was of the opinion that other information, such as records from the Department of Social Services, should have been produced by trial counsel for his review. *Id.*, at 135–36. It was unusual, based on his experience in capital cases, for the "starting data base to be as small as it was on this case." *Id.*, at 137. He also advised trial counsel by letter that due to Petitioner's disorders, he should not be allowed to make decisions concerning whom should be called as witnesses during the mitigation portion of the sentencing trial. *Id.*, at 145. "His wish to accept capital punishment is probably related to [an] aspect of child abuse syndrome, namely to view himself as to blame and as deserving of punishment . . . ." *Id.*, at 151. In Dr. Noble's opinion, he was retained too late in the course of the litigation to be able to establish a trusting relationship with the Petitioner. *Id.*, at 158. This impacted his ability to obtain information from the Petitioner. *Id.* However, Dr. Noble admitted that he agreed to take the case despite the time parameters. Dr. Noble did not receive preparation from trial counsel for his testimony. In fact, he made the outline of the questions to be asked. *Id.*, at 160. Nonetheless, he agreed that the mitigating factors submitted to the jury reflected his testimony, although he did not feel the jury's answers to those issues were consistent with his

testimony. *Id.*, at 170–71, 211. In Dr. Noble's opinion, the Petitioner was very limited in his ability to assist trial counsel during the sentencing phase. *Id.*, at 208.

Petitioner's attorneys presented the testimony of Dr. Claudia Coleman as an expert during the hearing. She testified that Petitioner did not want his family to testify during the hearing on the motion for appropriate relief. *Id.*, at 398. "He certainly realizes that there is a need for them to be here, at least based on what his counsel has presented to him. But his emotional response to it is that it is very, very difficult and that he really wishes they weren't here." *Id.*, at 398–99. Dr. Coleman also acknowledged that on one occasion she had testified in a capital murder case in which her testimony was the only evidence presented on the issue of mitigation. *Id.*, at 412.

Tom Portwood, one of Petitioner's trial counsel, was called to testify during the hearing on the motion for appropriate relief. Ted Cummings was lead counsel during the trial and Portwood worked primarily on the sentencing phase. *Id.*, at 51. Because the State did not initially decide to seek the death penalty, he was not appointed until late April 1993. *Id.*, at 53. When he was appointed, Cummings told him that Petitioner did not want his family contacted and did not want them to be involved in the mitigation portion of the trial. *Id.*, at 54. In fact, Petitioner did not want to present any evidence in support of mitigation but the attorneys were ultimately able to convince him to allow a psychologist to testify. *Id.* Upon entering the case, Portwood felt it was most important to convince Petitioner to have a psychological evaluation. *Id.*, at 57. Portwood thought it extraordinary that an individual facing the death penalty did not want to present mitigating evidence. *Id.*, at 55. In fact, he had never had a client in that situation who told him not to argue for the defendant's life. *Id.* Portwood described Petitioner as a "genuinely nice person" and found him "cooper-

ative up to a point. . . . He didn't want to present mitigating factors because if he was found guilty he felt like he would be, in his words, safer on death row than in the general population. And I found that to be an illogical response." *Id.,* at 58. Petitioner believed that if he were placed in the general prison population, he would kill himself or be killed by another inmate. *Id.,* at 107. Thus, he concluded he would live longer on death row. *Id.*

On Portwood's motion, the Superior Court ordered that Petitioner be evaluated at Dorothea Dix Hospital, a state facility. The evaluation was completed in late July 1993 and in Portwood's opinion, it raised sufficient issues to warrant an application to the court for an independent evaluation by a defense expert. *Id.,* at 67. Portwood experienced difficulty in locating a forensic psychologist willing to take the case. *Id.,* at 69. Dr. Noble was appointed on October 19, 1993, and his role was to establish the groundwork for a diminished capacity defense and mitigation factors. *Id.,* at 76. Portwood testified that even on the eve of the trial Petitioner had not grasped the seriousness of his case. *Id.,* at 85. "I also found it somewhat uncommon, even during the pendency of the trial, that Ronnie seemed to have less of a sense of the importance of what we were doing." *Id.* "I almost had the feeling that Ronnie was letting Ted and me present mitigating factors because he didn't want to hurt our feelings." *Id.,* at 88. In fact, during his evaluation at Dorothea Dix Hospital, Petitioner told the psychiatrist that he wanted to die. *Id.,* at 106. Petitioner remained adamant that his family not be involved throughout the trial. *Id.,* at 108–09. Portwood felt he could not ethically contradict his client's instructions. *Id.* Thus, the attorneys were forced to use Dr. Noble as the mitigation evidence. *Id.*

Portwood, who is now a recovering alcoholic, testified that during this time period he was consuming a approximately 12 ounces of alcohol each day. *Id.,* at 98–99. He never drank until he went home at night. *Id.* His normal work habits were to go to a health club each morning before work and to arrive at his office by 7:00 a.m. *Id.,* at 98. During the trial, he and co-counsel worked after court ended each day but he was always in bed no later than 10:00 p.m. *Id.,* at 99. So he consumed 12 ounces of alcohol between the time he got home and the time he retired. *Id.* Portwood did not believe that consumption affected his performance at trial. *Id.,* at 119. He never consumed alcohol during the work day and never performed any work on the case when he had consumed alcohol. *Id.,* at 119–20.

During the time when Portwood was drinking, he successfully defended a defendant accused of a double homicide who received a life sentence rather than a death sentence. *Id.* He defended another capital case in which the defendant was convicted of voluntary manslaughter and received a 52 year sentence. *Id.,* at 121. He defended three other capital defendants who received life sentences during the time when he was drinking. *Id.,* at 122. In each of those cases, his responsibility was the mitigation phase of the trial. *Id.* Thus, prior to the Petitioner's trial, Portwood had tried six capital cases and in only one of them was the death penalty imposed. *Id.,* at 123.

Petitioner's other trial counsel, Ted Cummings, also testified at the hearing. He reiterated the Petitioner was adamant in his refusal to call family members as mitigation witnesses. *Id.,* at 470–72. Until they were able to persuade him to use Dr. Noble, Cummings felt they were at an impasse with their client. *Id.* However, they reached a compromise by calling Dr. Noble. *Id.* Cummings also testified that he "never saw Mr. Portwood's professional demeanor or behavior affected by the consumption of alcohol, *if in fact* he was consuming alcohol during the course of the trial." *Id.,* at 477 (emphasis added).

Petitioner presented fifteen witnesses during the hearing, including family members who provided information about how they would have testified had they been called during the mitigation phase of the

trial. Judge Ferrell found Petitioner's trial counsel were not ineffective during the sentencing phase. Noting that at trial Dr. Noble did not testify the Petitioner was incompetent, he also found Petitioner was competent to participate in the sentencing phase. The Supreme Court of North Carolina denied Petitioner's petition for a *writ of certiorari.*

## II. STANDARD OF REVIEW

Section 2254 of Title 28, United States Code, provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The Fourth Circuit has recently interpreted this language.

[S]ubsection (1)[ ] prohibit[s] the issuance of the writ unless (a) the state court decision is in "square conflict" with Supreme Court precedent which is controlling as to law and fact or (b) if no such controlling decision exists, "the state court's resolution of a question of pure law rests upon an objectively unreasonable derivation of legal principles from the relevant supreme court precedents, or if its decision rests upon an objectively unreasonable application of established principles to new facts. In other words, habeas relief is authorized only when the state courts have decided the question by interpreting or applying the relevant precedent in a manner that reasonable jurists would all agree is unreasonable."

*Fitzgerald v. Greene,* 150 F.3d 357, 362 (4th Cir.), *cert. denied,* 525 U.S. 956, 119 S.Ct. 389, 142 L.Ed.2d 321 (1998) (quoting *Green v. French,* 143 F.3d 865, 870 (4th Cir.1998)).

## III. DISCUSSION

### A. Ineffective assistance of counsel during the sentencing phase of Petitioner's trial.

Petitioner's ineffective assistance claims are based on three grounds: (1) trial counsel failed to investigate adequately; (2) Mr. Portwood's alcohol addiction caused him to render ineffective assistance; and (3) Petitioner was incompetent to assist in his defense during the sentencing phase of the trial. The Supreme Court has stated the test for determining whether a defendant received adequate assistance of counsel.

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Unless a defendant makes both showings, his claim of ineffective assistance of counsel must fail. *Id.* Thus, a defendant must show counsel's performance fell below objective standards of reasonableness and, that but for his conduct, there was a reasonable probability the result of the trial would have been different. *Id.,* at 688, 104 S.Ct. 2052. "A court's review of counsel's performance is 'highly deferential.' Indeed, courts must afford a strong presumption that counsel's performance was within the wide range of professionally competent assistance." *Williams v. Taylor,* 163 F.3d 860, 866 (4th Cir.1998), *cert.*

*granted,* —— U.S. ——, 119 S.Ct. 1355, 143 L.Ed.2d 516 (1999).

Judge Ferrell made the following findings:

> There was no problem of communication with the defendant. He understood the nature of the charges against him and that it could lead to the death penalty, and in the opinion of Cummings, he was able to assist in his defense. However, the defendant forbade his trial counsel from contacting his family members to dig into matters that his trial counsel considered appropriate. His counsel during a number of conferences related to the defendant their view that family members, friends and associates should be called to testify and be present during the trial. But, from the outset the defendant told Cummings that he did not care to testify or speak on his own behalf, which the defendant later acknowledged on the record at trial before the Presiding Judge.

Exhibit 2, Order, *attached to* Petitioner's Response to Respondent's Motion for Summary Judgment and Petitioner's Memorandum in support of Petitioner's Motion for Summary Judgment, filed April 23, 1998, at 8 [Petitioner's Response].

### 1. Claims of failure to investigate.

Petitioner claims both that counsel inadequately investigated mitigating factors and they were ineffective for abiding by their client's instructions not to involve family members.

■ As soon as Portwood became involved in the case in late April, he tried to persuade Petitioner to allow mitigation evidence to be presented. The first step along this path was Petitioner's agreement to a psychiatric evaluation at Dorothea Dix. Two months after Portwood was appointed, Petitioner was admitted to that hospital for an evaluation.[3] This evaluation provided Portwood with additional information which justified a request for a separate evaluation. Moreover, the Dix report contained information which was used by counsel during the mitigation phase of the trial. Exhibit 1, Discharge Summary from Dorothea Dix Hospital, *attached to* Petition. The report referred to Petitioner's alcoholism and drug addiction, both in the past and at the time of the offense. *Id.* It recounted his medical history and past criminal history which included three prior convictions and imprisonment. *Id.* Abuse from the age of two was reported from his foster parents, including being whipped with a bullwhip.[4] *Id.* The examiner spoke with the Petitioner's brother who confirmed the child abuse and reported that Petitioner "gets along well with people but has a quick temper when he is high on drugs." *Id.*

Dr. Noble criticized counsel for not providing him with medical, school and Social Services records but acknowledged receipt of the report and "a stack" of documents from Dorothea Dix. Dr. Noble also admitted Petitioner did not want his family involved although permission was given for the doctor to speak with the brother. Dr. Noble wrote to counsel in order to assist them if they choose to ask for a continuance of the trial. Hearing Transcript, at 142. But he acknowledged such a decision was for counsel. *Id.* Dr. Noble testified that the lack of information from counsel "might" have constrained his ability to show mitigating factors. *Id.,* at 150. Yet,

---

**3.** Petitioner's counsel incorrectly state that Portwood "did nothing" for four months after his appointment.

**4.** In the Petition, current counsel state "although Portwood was aware that Petitioner had a history of child abuse, he testified that he did not remember any discussion 'of the bullwhip incidents and those sorts of things.'" Petition, at 23. In fact, Portwood testified, in response to the question of wheth-er Petitioner spoke with Portwood about his child abuse, "I'm sure we talked about it. I don't remember our discussion of the bullwhip incidents and those sorts of things, no sir." Hearing Transcript, at 89. Counsel have taken the testimony out of context. Portwood clearly testified that he discussed the child abuse with his client, but at the time of the hearing, did not recall specific conversations.

he admitted the jury found 34 mitigating factors and noted their findings were "overshadowed by the fact that they found the mitigating factors didn't matter." *Id.* And, while he criticized counsel for his late retention, Dr. Noble accepted the appointment and gave no indication either at trial or the hearing that he was unprepared or unable to render a competent evaluation and opinion. In fact, he admitted that after reviewing the supplemental information provided by current counsel, his diagnosis of the Petitioner did not change. *Id.,* at 162. The doctor also testified that, "My testimony is really that it would be helpful to the attorneys themselves and to the defendant if they were—if they would retain a mental health consultant earlier." *Id.,* at 209. As to his performance, additional time would have helped him develop a relationship with the Petitioner. *Id.* Dr. Noble did not testify either at the trial or the hearing that his evaluation was incomplete as a result of insufficient information. The undersigned therefore concludes that counsel adequately conducted pretrial investigation concerning mitigation.

■ Petitioner also argues that had counsel spoken with his family members, they would have uncovered additional evidence in mitigation and would have concluded it was necessary to call them as witnesses.

With respect to investigating mitigating evidence, counsel's performance is deficient if he fails to make a reasonable investigation for possible mitigating evidence. In the context of whether an attorney's investigation into matters that might aid his client constitutes a deficient performance, the Supreme Court has said:

[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness

case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. *The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.* Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically upon such information.... *[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.*

*Matthews v. Evatt,* 105 F.3d 907, 919–20 (4th Cir.1997) (quoting *Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052) (emphasis added) (other citations omitted). Petitioner was adamant that his family not be involved in the trial. "Although the decision to introduce mitigating evidence is a nonfundamental right which is waivable by the defense attorney on the defendant's behalf, petitioner here actually waived investigation and presentation of mitigating evidence himself after conferring with counsel." *Wallace v. Ward,* 191 F.3d 1235, 1247 (10th Cir.1999) (citations omitted). Thus, it was not ineffective assistance of counsel to fail to interview family members or to present them as witnesses. *Id.; Sexton v. French,* 163 F.3d 874, 887 (4th Cir. 1998), *cert. denied,* —— U.S. ——, 120 S.Ct. 139, 145 L.Ed.2d 118 (1999) ("[T]rial counsel's alleged failure to secure [defendant's] consent to present certain mitigating evidence at sentencing does not render trial counsel's performance constitutionally ineffective.").

Moreover, it cannot be overlooked that Portwood convinced Petitioner to undergo an evaluation at Dorothea Dix Hospital.

Then, he and Cummings convinced Petitioner to allow Dr. Noble to testify during the sentencing phase of the trial. The information which would have been provided by family members was placed before the jury by Dr. Noble. And, "[a]lthough counsel has the obligation to conduct a reasonable investigation even if the defendant is reluctant to cooperate," trial counsel here did conduct a reasonable investigation. *Matthews, supra.* It may be true, as Mr. Portwood acknowledged during his testimony, that it is always best to have a defendant's mother ask a jury to spare her child's life. However, Petitioner made an informed decision after consultation with his attorneys. *Wallace, supra.* The efforts of his current attorneys to avoid the death penalty by casting aspersions at trial counsel's performance do not "apply[ ] a heavy measure of deference to counsel's judgments," as is required. *Matthews, supra.*

Counsel also argue trial counsel had a duty to present mitigating evidence through Petitioner's family despite his wishes. They produced an expert witness who testified that trial counsel failed to inform the court they had reached an impasse with their client on the issue of mitigation evidence, thereby failing to make a record thereof. In his opinion, trial counsel were then obligated to follow the court's instructions on this score. Hearing Transcript, at 230–32. However, this opinion is contrary to North Carolina and federal law.

Normally, the responsibility for tactical decisions, such as the type of defense to present and what witnesses to call, "rests ultimately with defense counsel." However, as we have said, "when counsel and a fully informed criminal defendant client reach an absolute impasse as to such tactical decisions, the client's wishes must control; this rule is in accord with the principal-agent nature of the attorney-client relationship." In *Ali* we stated that when such impasses arise, defense counsel should make a record of the circumstances, the advice given to the defendant, the reasons for

the advice, the defendant's decision, and the conclusion reached.

*State v. White,* 349 N.C. 535, 567, 508 S.E.2d 253, 273 (1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 2376, 144 L.Ed.2d 779 (1999) (quoting *State v. Ali,* 329 N.C. 394, 404, 407 S.E.2d 183, 189 (1991)) (other citations omitted). Here, trial counsel testified that, in their opinion, they were not at an impasse because Petitioner agreed to allow Dr. Noble to testify and through his testimony, they were able to present mitigation evidence. Trial counsel made the decision to present mitigating evidence through the psychologist and to abide by the Petitioner's desires concerning his family. *State v. McDowell,* 329 N.C. 363, 381, 407 S.E.2d 200, 210 (1991) (Giving deference to a client's wishes is not ineffective assistance where counsel did not abdicate his role as effective counsel.). Nor does the undersigned find there was an "absolute impasse." *State v. Wilkinson,* 344 N.C. 198, 210–12, 474 S.E.2d 375, 381–82 (1996). Assuming arguendo that an impasse existed, counsel followed Petitioner's instructions as required by state case law. *White, supra.*

As noted previously,

"Failure to present particular mitigating evidence often leads to claims that counsel should have introduced such evidence or investigated further [while] the introduction of evidence that the jury does not credit or that the state turns to its advantage leads to ineffectiveness claims also." As a result, we have held that "[t]he best course for a federal habeas court is to credit plausible strategic judgment." ... [Petitioner's] counsel indicated that his trial strategy was to introduce evidence of [Petitioner's] background through Dr. [Noble] rather than people who had not seen [Petitioner] in years. Counsel believed that Dr. [Noble] would give the evidence added significance while simultaneously laying the foundation for his mental assessment. We must respect this reasonable trial tactic.

*Wright v. Angelone,* 151 F.3d 151, 162 (4th Cir.1998) (quoting *Truesdale v. Moore,* 142 F.3d 749, 755 (4th Cir.1998) and *Bunch v. Thompson,* 949 F.2d 1354, 1364 (4th Cir. 1991)). Moreover, the " 'reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.' " *Thomas v. Taylor,* 170 F.3d 466, 471 (4th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 2361, 144 L.Ed.2d 254 (1999) (quoting *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052). Counsel did not speak with or call family members as witnesses in deference to Petitioner's wishes. Nonetheless, the information they would have provided was presented through Dr. Noble's testimony. Petitioner's argument that counsel failed to adequately investigate "essentially comes down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing." *Kitchens v. Johnson,* 190 F.3d 698, 703 (5th Cir.1999).

Finally on this issue, Petitioner claims that if certain witnesses, primarily family members, had been called during the sentencing phase there is a reasonable probability that the jury would not have imposed the death sentence. Although the undersigned has concluded that counsel were not ineffective for failing to present such witnesses, this claim is addressed for purposes of finality.

Petitioner's foster father, Steven Ford, testified at the hearing that Petitioner's biological mother simply gave her children to him and his wife. Ford testified he was an alcoholic at the time and could not handle children. He did not remember whipping the children although his wife would show him the wounds the next morning. Although he did not remember doing such things, he acknowledged "it would take a beast to do that." David Frye, Petitioner's brother, testified that Ford was nice enough until he drank and "then he went crazy." He testified that sometimes Ford would make the boys fight each other until one of them began bleeding. About half of the days in a month, the boys were beaten. He described finding Petitioner as a "a bloody pulp." The next day the school authorities noticed his wounds and the boys were removed. When they were taken from the Fords, they were sent to separate institutions until they went to live with their biological father.

Petitioner's stepmother, Carline, testified at the hearing that after the foster parents were arrested, Social Services sought to place the boys with their biological father, Benson Frye, because their mother would not take them. She testified that within a month of their coming to live with them, Benson began to beat her, sometimes in front of the children. This terrified them and they "were running around like little chickens." Carline was beaten by her husband for three years before she finally left. When she returned to remove her belongings, the boys were living in squalor without electricity or water.

After his divorce from Carline, Benson married Shirley and they had a daughter, Angie, who is sixteen years younger than Petitioner. Angie testified that she and Petitioner were close and remained so. Angie said Benson beat her mother and sometimes made the children watch. Shirley testified that Benson had never wanted the boys to live with him and after they went to live with their mother, he never saw them.

Petitioner's mother, Carolyn, testified that her husband left her after the birth of their last child. She admitted that she gave the children away and did not see them until Social Services removed them from Benson's home. She testified that had she been called, she would have begged the jury for her son's life.

Petitioner's maternal aunt testified that he was hospitalized for five days as a two year old after drinking kerosene.

Cynthia Maxwell is a mitigation specialist who testified at the hearing. She recounted details of how Carolyn gave her

children away to complete strangers with no remorse or emotion. She also testified that a local grocer had been feeding the boys when they lived with Benson because Benson provided them with no food or other necessities. She prepared a time-line which would have presented the jury with the details of Petitioner's childhood.

The information to which these witnesses would have testified was presented at trial through Dr. Noble's testimony. Petitioner, Dr. Noble noted, did not know his father until he was eight years old or his mother until the age of eleven. He testified that Petitioner's mother had turned the children over to foster care when Petitioner was two years old. He recounted the physical abuse suffered by Petitioner at the hands of Ford, abuse which began the first day the Fords took the children. He described the bullwhipping and the fact that Petitioner would be pulled from his sleep to be beaten. He also testified that Ford, who drank often, sometimes made Petitioner eat off of the floor beneath the kitchen table. And, on one occasion, Petitioner described how Ford failed to acknowledge Christmas Day and the boys went without any presents. After removal from the Fords, the boys lived sporadically with one or the other biological parent allowing insufficient time to establish any bonding. Petitioner's mother made him drop off his high school baseball team to work an evening shift job. This caused Petitioner to drop out of school altogether. Noble testified that Petitioner suffered from paranoia, substance abuse, mixed personality disorder and child abuse syndrome. At the time of the murder, Petitioner had a diminished capacity to know right from wrong and his behavior was fueled by psychosis and intoxication.

The jury found each of the above to be mitigating factors. In addition, they found Petitioner had never been nurtured or had a parental role model. They found he was in chronic emotional pain and used drugs to medicate that pain. At the time of the murder, they found Petitioner acted under a compulsion due to his cocaine addiction.

And they acknowledged that the Petitioner had wanted a normal life and did not want to die. The undersigned concludes that every fact which would have been presented by these witnesses was placed before the jury by Dr. Noble's testimony. The fact that testimony from family members would have been more poignant is insufficient to show either ineffective assistance or a reasonable probability of a different outcome.

> Present counsel have proffered [testimony] from [Petitioner's family members] which, if believed, indicate that they could have provided additional mitigating circumstance evidence if they had been called as witnesses. It is not surprising that they have done so. Sitting en banc, we have observed that "[i]t is common practice for petitioners attacking their death sentences to submit [testimony] from witnesses who say they could have supplied additional mitigating circumstance evidence, had they been called," but "the existence of such [testimony], artfully [elicited] though they may be, usually provides little of significance." Such [testimony] "usually proves at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings in the performance of prior counsel." ... "The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel."

*Williams v. Head,* 185 F.3d 1223, 1236–37 (11th Cir.1999) (quoting *Waters v. Thomas,* 46 F.3d 1506, 1513–14 (11th Cir.1995)). Contrary to the contentions raised here, Dr. Noble effectively presented the jury with the picture of Petitioner as a "thrown-away" child who never lived with anyone who was not severely dysfunctional. He explained Petitioner's paranoia and child abuse syndrome by stating Petitioner craved human contact but was terrified of

it. He portrayed Petitioner as a young man who cried when he watched television programs because they showed the kind of family he never had experienced. And, Dr. Noble described the relationship between Petitioner and his victim as "emotionally charged" due to the fact that the Petitioner saw Ralph as a father figure.

> Thus we ask not whether, with the benefit of hindsight, we would have conducted the defense differently. In the wake of a conviction and death sentence such a conclusion "is all too tempting." Rather we must place ourselves in the shoes of [Petitioner's] attorneys and ask only whether their choices were objectively unreasonable.

*Truesdale*, 142 F.3d at 753. The choices made by trial counsel concerning these witnesses were not objectively unreasonable.

Finally, David Haynes, son of the local chief of police, testified that when Petitioner's foster father was arrested for child abuse, photographs were taken of the Petitioner as an eight year old which showed the extensive scarring suffered as a result of the whippings. Haynes testified that he would have been willing to testify during the trial and to produce the photograph attached as Exhibit 2 to the Petition. Portwood, it is claimed, had no idea that such photographs existed but should have discovered them during pretrial investigation. Motion for Appropriate Relief, at 81. However, this does not

> demonstrate[ ] that [Petitioner's] sentencing counsel was constitutionally ineffective. Although counsel should conduct a reasonable investigation into potential defenses, *Strickland* does not impose a constitutional requirement that counsel uncover every scrap of evidence that could conceivably help their client.... Perhaps such [a photograph] may have assisted [Petitioner], but we cannot say that their failure to under-

take such efforts rendered their conduct constitutionally deficient under *Strickland.*

*Green,* 143 F.3d at 892.

### 2. Trial counsel's alcohol addiction.

■ Petitioner also claims that Portwood rendered ineffective assistance by virtue of his alcohol addiction at the time of the trial. In support of this, Petitioner notes Portwood's testimony that at the time of the trial he consumed approximately 12 ounces of alcohol daily. Petitioner also notes that "[i]n the period prior to the Frye trial, Mr. Portwood testified that he had been in a car accident as a passenger. His blood alcohol level that night was over a 0.40." Petition, at 35. Portwood actually testified that 20 months prior to the Frye trial, he had been involved in the accident. Hearing Transcript, at 119. He also testified that his consumption did not impact his performance and he never consumed alcohol during the day or when he was working on the case.[5] *Id.*, 119–20.

Petitioner does not state in what manner Portwood's performance was impaired by his addiction. He does not cite any aspect of his trial which was affected by such addiction. Nor is any legal precedent cited. The sole information offered in support of this claim is the opinion of a proposed expert in capital litigation who testified that he did not believe counsel could perform at a minimal level if consuming 12 ounces of alcohol per evening. That expert, who is not an addiction expert, offered no instance in which he claimed that intoxication impaired trial counsel's performance.

"[U]nder *Strickland* the fact that an attorney used [alcohol] is not, in and of itself, relevant to an ineffective assistance claim. The critical inquiry is whether, for whatever reason, counsel's performance was defi-

---

**5.** In yet another mischaracterization of testimony, counsel state that co-counsel Cummings testified he did not know if Portwood was consuming alcohol during the trial. Cummings actually testified, "I never saw Mr.

Portwood's professional demeanor or behavior affected by the consumption of alcohol, if in fact he was consuming alcohol during the course of the trial." Hearing Transcript, at 477.

cient and whether that deficiency prejudiced the defendant." *Berry v. King,* 765 F.2d 451, 454 (5th Cir.1985); *Caballero v. Keane,* 42 F.3d 738, 740 (2d Cir.1994); *Young v. Zant,* 727 F.2d 1489, 1492–93 (11th Cir.1984); *Middleton v. Evatt,* 77 F.3d 469 (table), 1996 WL 63038 (4th Cir. 1996). Each instance of alleged ineffectiveness has been reviewed by this Court and no failure in performance has been found. The record fails to support any claim that Portwood's handling of pretrial investigation or sentencing issues was affected by his alcohol consumption. *Id.* The fact alone that Portwood subsequently admitted to having a problem cannot be used as a "post hoc rationalization intended to defeat imposition of the death penalty." *Id.,* at *8.

Petitioner also claims that Judge Ferrell failed to address this issue in his decision. However, the Judge made findings of fact and conclusions of law in support of his determination that neither counsel was ineffective in his performance. The Court "finally determined that [Petitioner] was not entitled to relief." *Cardwell v. Greene,* 152 F.3d 331, 339 (4th Cir.), *cert. denied,* 525 U.S. 1037, 119 S.Ct. 587, 142 L.Ed.2d 491 (1998); *Wright,* 151 F.3d at 156–57; *Carter v. Lee,* 1999 WL 1267353 at *5 (4th Cir.1999) (A perfunctory decision is an adjudication). Thus, there is no merit to this claim. Moreover, "[t]he finding that [Portwood's] legal work was not adversely affected by his [addiction] ... is entitled to a presumption of correctness in this federal habeas corpus proceedings. We cannot say that the [Superior Court's] findings, ... are 'an unreasonable determination of the facts in light of the evidence presented.'" *Williams v. Taylor,* 163 F.3d at 871–72 (citations omitted).

### 3. Petitioner's competence during the sentencing phase.

█ During the hearing in connection with the motion for appropriate relief, Dr. Noble testified that Petitioner's abuse as a

child caused him to be reluctant to open up to his attorneys and trust their recommendations. Hearing Transcript, at 144–45. When asked if Petitioner's refusal to allow mitigation witnesses was a competency issue, he replied, "It was a kind of competency issue, one that's not recognized as frequently as competency to proceed or stand trial." *Id.* Dr. Noble also testified that Petitioner's refusal to allow mitigation witnesses occurred "because he was acting out some adult manifestation of having been abused as a child, and he was not really—he was not really competent to direct his counsel in that area." *Id.* He also opined that the evaluation from Dorothea Dix was only directed at the Petitioner's competency to stand trial, not his competency to be sentenced. *Id.,* at 208. "I think he was very limited in his ability to assist trial counsel during sentencing. He fell short of knowing intelligently, voluntarily, the standard for his ability to participate." *Id.*

Dr. Clabe Lynn is the psychiatrist at Dorothea Dix Hospital who was in charge of the Petitioner's evaluation of competency to stand trial. He testified at the hearing that in his opinion the Petitioner "was competent to stand trial and was able to assist his attorneys and he knew the consequences of what he was charged with and the possible outcome." *Id.,* at 509. His evaluation and opinion were not limited to the guilt phase of the trial: "I would include the sentencing phase. We don't break it down. Competency to stand trial includes the entire trial." *Id.,* at 510. In rendering this opinion, Dr. Lynn was aware that Petitioner did not want his family contacted and thus, was aware he had hesitations concerning mitigation. *Id.,* at 511. However, he was not aware that Petitioner did not want any mitigation evidence placed before the jury.[6] *Id.* He was not asked and did not testify that this would have changed his opinion concerning competency.

---

**6.** Based on this testimony, counsel claim Dr. Lynn admitted on cross-examination that "he had not been told that there were problems

concerning Petitioner's stance toward mitigation." Petition, at 40.

Petitioner argues trial counsel should have moved to continue the case to allow additional time for Dr. Noble to persuade him to allow mitigation evidence. He also states trial counsel did not advise the court that the psychologist had raised a competency issue. Thus, it is argued he did not receive full due process and representation. However, Dr. Noble never raised any issue of competency during the trial itself, and at the hearing in connection with the motion for appropriate relief, he testified that the Petitioner understood the charges against him, understood he was being tried for murder, understood he faced the death penalty, had no evidence sufficient to show organic brain disorder, was not retarded, had average intelligence and was able to communicate although he was reluctant to speak about emotional issues. Hearing Transcript, at 196–97. Dr. Noble testified that in October and November of 1993, it was his opinion that the Petitioner was able to cooperate with his attorney, to help in formulating a defense and was competent to stand trial. *Id.,* at 202–03.

Dr. Noble's inconsistent testimony "is not persuasive evidence of [incompetency] because it is nothing but a post hoc rationalization intended to defeat imposition of the death penalty." *Middleton,* 1996 WL 63038 at \*8. Nor does his revised testimony show Petitioner was not legally competent during the sentencing phase of his trial. Under North Carolina law, no person may be sentenced "when by reason of mental illness or defect he is unable . . . to assist in his defense in a rational or reasonable manner." N.C. Gen.Stat. § 15A–1001(a). "[A] defendant does not have to be at the highest stage of mental alertness to be competent to be tried. So long as a defendant can confer with his or her attorney so that the attorney *may interpose any available defenses for him* or her, the defendant is able to assist his or her defense in a rational manner. It is the attorney who must make the subtle distinctions as to the trial." *State v. Shytle,* 323 N.C. 684, 689, 374 S.E.2d 573, 575 (1989) (emphasis added) (Defendant competent to

stand trial and sentencing despite gunshot wound which resulted in brain injury which impaired her emotional responses causing her not to appreciate the seriousness of her situation.); *State v. O'Neal,* 116 N.C.App. 390, 448 S.E.2d 306 (1994) (No error in judge's ruling that defendant who was hearing voices and saw "little red men" was competent to stand trial.); *State v. Harding,* 110 N.C.App. 155, 429 S.E.2d 416 (1993) (Defendant who was using drugs during trial still competent to assist in defense.).

Here, despite Petitioner's reluctance, trial counsel did place mitigation evidence before the jury. There is no competent evidence that Petitioner could not confer with his attorneys concerning defenses or that he could not assist in a rational manner. Moreover, " 'habeas relief is authorized only when the state courts have decided the question by interpreting or applying the relevant precedent in a manner that reasonable jurists would all agree is unreasonable.' " *Fitzgerald,* 150 F.3d at 362 (quoting *Green v. French, supra* ). Such is not the case here.

**B. Errors related to jury selection.**

**1. Instructions by the court prior to selection.**

■ Petitioner takes issue with several statements made by the trial court during the jury selection process. The full text of the statements are set forth below with that portion to which Petitioner objects italicized.

After informing the potential jurors that the Petitioner had been charged with first degree murder, the judge made the following comments:

> [The defendant] has pleaded not guilty. Under the law the fact that he has been charged with this offense is not evidence of guilt. He is not required to prove his innocence. He is presumed to be innocent, and the state must establish his guilt beyond a reasonable doubt. Do each of you understand this? If you do

understand this, please indicate that you do by raising your right hand. (All jurors indicated in the affirmative.) *If chosen to sit as a juror, will you follow this law and require the state to satisfy you of the defendant's guilt beyond a reasonable doubt before you vote to find him guilty?*

Trial Transcript of Jury Selection, at 57 [Jury Selection Transcript] (emphasis added). Based on this exchange, Petitioner claims the court presupposed he would be found guilty. Thus, he claims the court should also have asked jurors whether they would vote to find Petitioner not guilty if the State did not satisfy its burden of proof. The North Carolina Supreme Court addressed this issue and held, "[W]e conclude that no reasonable juror would have interpreted the question as indicating an opinion of the court" concerning Petitioner's innocence or guilt. *Frye,* 341 N.C. at 488, 461 S.E.2d at 672. The undersigned concurs; contrary to Petitioner's contention, the trial court was in fact charging the jury that the Petitioner is innocent unless and until proven guilty beyond a reasonable doubt.

The court's charge continued: ˙

Under the law of North Carolina first degree murder is a crime which is punishable by life imprisonment or death. Do each of you understand this? If you do, please raise your hand. Under North Carolina law the jury must first decide whether or not the defendant is guilty of first degree murder. If he is found guilty of that offense, then the Court will conduct, as soon as practical, and usually before the same jury, a proceeding to determine whether the defendant will be sentenced to death or life imprisonment. Do you understand this? If you do, please raise your hand. (All jurors indicated in the affirmation.) After the jury has heard all the evidence as to the issue of guilt or innocence, the Court will instruct the jury that if the state has satisfied all twelve jurors of the existence of the facts which under the law constitute first degree murder, then it is the jury's duty to return a verdict of guilty of first degree murder; but if not, to find the defendant not guilty of that offense. Do each of you understand this? And if you do, please raise your right hand. (All jurors indicated in the affirmative.) *If you serve as a juror in this case, and the state has satisfied you of the existence of those things beyond a reasonable doubt, will you vote to find the defendant guilty of first degree murder or would your personal convictions about the death penalty prevent or substantially impair the performance of your duty in accordance with your instructions and your oath?*

Jury Selection Transcript, at 58–59 (emphasis added). Petitioner claims this exchange required each juror to render a decision of his or her competence to serve and had the effect of "staking out" jurors by eliciting an agreement to vote for conviction. The North Carolina Supreme Court concluded the exchange "sought to assort those prospective jurors who were unable to find defendant guilty, regardless of the evidence presented by the State, because of their views about capital punishment. Such jurors may be excused for cause." *Frye,* 341 N.C. at 489, 461 S.E.2d at 672 (citing *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)).

The undersigned agrees that the question was not one which "attempt[ed] to 'stake out' the jurors and determine˙what kind of verdict the jurors would render under a given set of circumstances ...." *State v. Nobles,* 350 N.C. 483, 515 S.E.2d 885, 894 (1999). The question obviously was designed to ascertain whether a potential juror's beliefs about the death penalty would interfere with that juror's ability to follow the law in making a determination of the Petitioner's guilt. In other words, would the juror's views about the death penalty " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright,* 469 U.S. at 424, 105 S.Ct. 844 (quoting

*Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)). Thus, it was a proper question. *Nobles, supra.*

### 2. Erroneous excusal for cause.

■ Potential juror Sandra Mallonee was excused by the court for cause after an exchange which included the following dialogue.

The State:

Q. In other words, if we prove our case to you knowing that you may have to pass on a death penalty question later, could that keep you from voting for guilty?

A. Yes. I would hate to, although I believe in the death penalty, I would hate to be a deciding factor in someone's life.

. . . . .

Q. If through our evidence we've proved that, we've proved our case to you, beyond a reasonable doubt, knowing that the next step is what his punishment is going to be, you think that would substantially impair you from performing your duty according to your oath that the judge tells you in the sentencing stage?

A. Yes again. I don't want to do that.

. . . . .

Defense counsel:

Q. The question I ask to you at this time is are you saying that your feelings are such that you would not follow the law as Judge Hyatt gives it to you, if you're asked to sit as a juror on this case?

A. Would it be if everybody—would everybody have to be unanimous on their—

The Court: Yes, ma'am.

Q. It would have to be everybody has to follow the same law. The Court would advise the entire jury panel after selected at the appropriate time of what the law is, and then it would be up to you, if you're selected to sit on this jury, to obey the law. And to follow the law. Can you do that?

A. Yes. I can.

. . . . .

The Court: Ms. Mallonee, you have answered the state in one way and Mr. Cummings in another way. I need to ask you these questions again. If you serve as a juror in this case and the state has satisfied you of the existence of those things which constitute first degree murder beyond a reasonable doubt, will you vote to find the defendant guilty of first degree murder or would your personal convictions about the death penalty prevent or substantially impair the performance of your duty in accordance with your instructions and your oath?

A. I could find him guilty but would not want to give the death penalty.

The Court: Well, whether you want to or not, what I have to determine is whether you can follow the law. And if the law is such that you have found the defendant guilty of first degree murder (sic) then you must consider whether to impose the death penalty or not impose the death penalty. And when the state has proved beyond a reasonable doubt that the aggravating factor or factors when considered with the mitigating factors are sufficiently substantial, that is, significant enough to mandate the imposition of the death penalty, will you follow the instruction of the court and recommend the death penalty, or if the state has not so proved will you recommend the punishment of life imprisonment? In other words, if the state has carried its burden, would your personal convictions prevent you from recommending the death penalty?

A. Yes.

Jury Selection Transcript, at 501–05. The trial court excused this juror for cause.

Petitioner argues this exchange shows only that Ms. Mallonee had misgivings about the death penalty but nonetheless could follow the law at the guilt phase of the trial. He also contends that questioning by defense counsel resolved any ambiguity in her answers. And, the juror's answer to the Court's last question was ambiguous because it is impossible to ascertain which question she was answering.

> "[A] juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do"; such a juror is not impartial and should be removed for cause. A corollary of the right to an impartial jury is the requirement of a voir dire sufficient to permit identification of unqualified jurors because without an adequate voir dire, a trial judge will not be able to remove unqualified jurors and the defendant will not be able to exercise challenges for cause.... Questions directed simply to whether a juror can be fair, or follow the law, are insufficient.

*Yeatts v. Angelone,* 166 F.3d 255, 265 (4th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 1517, 143 L.Ed.2d 668 (1999) (quoting *Wainwright,* 469 U.S. at 424, 105 S.Ct. 844) (other citations omitted). Here, defense counsel's questions related to whether the juror could follow the law. At first, the juror asked whether the verdict would have to be unanimous, which the court could certainly construe as an indication that the juror felt she could always "hang" the jury on the issue of the death penalty. Defense counsel repeated the question, intentionally avoiding the more difficult issue of capital punishment. Thus, it was incumbent on the trial court to make an unequivocal determination, if possible. The juror clearly stated her personal convictions would prevent her from recommending the death penalty. *Nobles,* 515 S.E.2d at 893 ("The decision to excuse a prospective juror is within the discretion of the trial court because 'there will be situa-

tions where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.'" (quoting *Wainwright,* at 425–26, 105 S.Ct. 844)).

Moreover, viewing the juror's responses as ambiguous, the undersigned is constrained to "review the determinations of the trial judge, who had the benefit of first-hand exposure to the voir dire, with deference. This deference means that where a venireman's responses reveal some ambiguity about his willingness or ability to impose the death penalty, we presume the correctness of the trial court's decision" to excuse him for cause. *Truesdale,* 142 F.3d at 757. Such is the case here. *Nobles,* 515 S.E.2d at 894 ("While the voir dire of this prospective juror may have indicated her ambivalence toward the death penalty, we hold that she was properly excused for cause because that testimony also demonstrated that she would be unable to render a verdict in accordance with the trial court's instructions and the laws of the state.").

### 3. Comment by the court on the evidence.

█ Next, Petitioner objects to the following instruction given during jury selection:

> Members of the jury, if the defendant is found guilty of first degree murder, then the Court will conduct a sentencing trial. At that trial the same jury will hear the evidence from the state of aggravating factors, those factors which suggest that the death penalty should be imposed. And then the defendant may present evidence of mitigating factors, that is, those factors which suggest that life imprisonment should be imposed.

Jury Selection Transcript, at 61. Petitioner argues this instruction was a comment by the judge on the evidence, a statement that the State *would* have aggravating evidence but the defendant *might* not have any mitigation evidence. However, there is no punishment phase in a capital case unless the State has evidence of at least one aggravating factor; indeed, if there is

such evidence the State must submit it to the jury. *State v. Huffstetler*, 312 N.C. 92, 102, 322 S.E.2d 110, 117 (1984); *State v. Lineberger*, 342 N.C. 599, 604, 467 S.E.2d 24, 26–27 (1996). And, it is only after the presentation of such evidence that a defendant may elect to present mitigation evidence. *State v. Taylor*, 304 N.C. 249, 276–77, 283 S.E.2d 761, 779 (1981), *overruled on other grounds, State v. Conner*, 335 N.C. 618, 440 S.E.2d 826 (1994). And, as noted *infra*, a defendant may determine to present no mitigation evidence. Thus, the language used by the trial court was not a comment but an explanation of the procedure which would be followed. *Huffstetler, supra.* ("The statement by the trial court merely had the effect of informing potential jurors that the jury's function might involve both a determination of guilt or innocence and a determination of the appropriate sentence. Since a sentencing hearing in fact was required, it is clear that the statement complained of did not prejudice the defendant.").

### 4. Failure to allow individual questioning and failure to question *ex meri motu*.

■ Potential juror Kenneth Pless advised during *voir dire* that he was close friends with a man who knew the victim's brother. He and his friend had discussed the case and Pless had formed an opinion as to the guilt or innocence of the Petitioner. Pless was excused for cause; however, Petitioner does not claim that his excusal was error. Instead, Petitioner argues it was error to deny counsel an opportunity to question Pless concerning whether his opinion had been shared with other members of the jury pool. Petitioner notes other potential jurors admitted hearing facts of the case from members of the jury pool. Thus, he claims it was critical to ascertain whether Pless had shared his opinion of Petitioner's innocence or guilt.

Prior to selection of Mr. Pless, it was learned that a juror had brought a newspaper into the jury room and that it had been read by one of the jurors who had been passed on by both sides. Jury Selection Transcript, at 524–35. When this occurred, the trial court brought in the jury and questioned them about their knowledge of the case from any source outside the courtroom. *Id.* The attorneys were also allowed to question individual jurors. *Id.* As a result of these proceedings, two jurors were excused by the court *sua sponte.* *Id.* A third juror was excused for cause on the State's motion due to his having read newspaper articles. *Id.*, at 577–84. At that time, Mr. Pless was called to the jury box and later excused due to his relationship with a friend of the victim's brother. Defense counsel sought to question Pless concerning whether he had shared any information from that relationship with other potential jurors. Although the court did not allow defense counsel to question Mr. Pless, the jurors selected both before and after his excusal were consistently questioned about whether they had learned anything about the case from any source other than the court.[7] Jury Selection Transcript, at 51–52, 64–65, 82, 86, 117, 127–28, 156–57, 227–31, 306–07, 333, 393, 413, 427, 439–40, 459, 464, 482–83, 497, 509, 521–22, 524–26, 542, 610–17, 620–26, 633–37, 649–51, 657, 668, 675, 713–14, 749–51, 772–74, 781–82, 792. When jurors indicated they had, they were questioned extensively about those contacts. No juror indicated any contact except newspaper articles and comments from members of the venire. No juror stated he or she had received any information from Pless. Each one was questioned about whether the information learned from the article could be put out of his or her mind and whether an opinion had been formed.[8] *Id.*

7. It is noted, however, that the majority of this questioning was done by the State's attorney.

8. One prospective juror reported that she had seen an article about the case at her grandmother's home. Jury Selection Transcript, at 649–51. However, she also stated that it was her understanding the judge had instructed her she could not allow any such information to sway her opinion. *Id.* Defense counsel did not inquire further of her.

Thus, the issue of any comments made by Pless to potential jurors was adequately covered. *Mu'Min v. Virginia,* 500 U.S. 415, 431, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991) ("[E]ach time an individual juror indicated that he had acquired knowledge about the case from outside sources, he was asked whether he had formed an opinion; none of the jurors seated indicated that he had formed an opinion.").

The same reasoning applies to the Petitioner's argument that the court failed to adequately question prospective jurors about outside contact after the discovery of the newspaper in the jury room. First of all, those jurors were questioned by the court and the State's attorney concerning their exposure to outside information about the case. "Qualified jurors need not ... be totally ignorant of the facts and issues involved.... 'It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.'" *Murphy v. Florida,* 421 U.S. 794, 799–800, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975) (quoting *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)). This procedure was followed in each instance where a juror revealed outside contact.

> "Despite its importance, the adequacy of *voir dire* is not easily subject to appellate review. The trial judge's function at this point in the trial is not unlike that of the jurors later on in the trial. Both must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions. In neither instance can an appellate court easily second-guess the conclusions of the decisionmaker who heard and observed the witnesses." ... Part and parcel of deference to the trial court's conduct of voir dire is a reluctance to second-guess the court's decision to refuse inquiry into certain matters.

*United States v. Lancaster,* 96 F.3d 734, 739 (4th Cir.1996) (quoting *Rosales–Lopez v. United States,* 451 U.S. 182, 188, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981)). The undersigned cannot find the trial court erred in its jury selection procedures.

### 5. Failure to allow questioning about parole eligibility.

■ The trial court refused to allow Petitioner's attorneys to question potential jurors during *voir dire* about their understanding of the meaning of the term "life imprisonment." Petitioner claims this denied him due process, an argument based on the Supreme Court decision in *Simmons v. South Carolina,* 512 U.S. 154, 171, 178, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). The Court there held that a capital defendant is constitutionally entitled to inform the sentencing jury of his ineligibility for parole by argument or instruction when "(1) the prosecution makes the 'future dangerousness' argument that the defendant will pose a threat to society in the future and (2) the only available alternative sentence to death is life imprisonment without the possibility of parole." *Ramdass v. Angelone,* 187 F.3d 396, 404 (4th Cir.1999), *cert. granted in part,* —— U.S. ——, 120 S.Ct. 784, 145 L.Ed.2d 659 (2000).

The North Carolina Supreme Court has consistently held that a defendant is not entitled to question prospective jurors about their opinions concerning a defendant's eligibility for parole. *State v. Gray,* 347 N.C. 143, 190, 491 S.E.2d 538, 560 (1997), *cert. denied,* 523 U.S. 1031, 118 S.Ct. 1323, 140 L.Ed.2d 486 (1998); *State v. Chapman,* 342 N.C. 330, 340, 464 S.E.2d 661, 666 (1995). That Court has also held, in discussing *Simmons,* that "where the State does not argue future dangerousness, as in the instant case, there is no due process requirement that the jury be informed that defendant would be parole ineligible under a life sentence." *State v. Parker,* 350 N.C. 411, 516 S.E.2d 106, 125 (1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 808, 145 L.Ed.2d 681 (2000). In Petitioner's case, the State made no argument concerning future dangerousness and thus, *Simmons* does not apply.

Moreover, at the time of Petitioner's sentencing, a defendant sentenced to life imprisonment in North Carolina was eligible for parole after serving a 20–year sentence. *State v. Conner,* 345 N.C. 319, 331, 480 S.E.2d 626, 631 (1997) (citing N.C. Gen.Stat. § 15A–1371(a1) (1988)). Thus, the second prong of *Simmons,* that the only alternative to death is life imprisonment without parole, is also inapplicable. The legislature repealed this statute in 1994 and amended § 15A–2002 "to provide that a defendant sentenced to life imprisonment for first-degree murder committed on or after 1 October 1994 shall not be eligible for parole." *Id.* The statute also requires the judge to so instruct a jury. *Id.* However, the legislature precluded retroactive application of the statute in order to avoid violations of the constitutional prohibition against *ex post facto* application of punitive laws. *Id.* Thus, at the time of Petitioner's trial and sentencing, he was not entitled to such an instruction.

In essence, Petitioner seeks to extend *Simmons* to include cases where a defendant remains eligible for parole although sentenced to life imprisonment.

> Justice O'Connor's opinion [in *Simmons* ] limits the right to receive such an instruction to those instances where the alternative sentence is life without parole. We have repeatedly rejected attempts to expand the *Simmons* rule to apply to prisoners who are eligible for parole. Since [Petitioner] would have been eligible for parole had he not been sentenced to death, *see* N.C. GEN. STAT. § 15A–1371(a)(1) (1994), he is not entitled to any relief under our current interpretation of *Simmons,* and any rule announced here would be barred under *Teague.*

*Keel v. French,* 162 F.3d 263, 270 (4th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 2353, 144 L.Ed.2d 249 (1999) (citations omitted); *accord, Ramdass,* 187 F.3d at 406; *Roach v. Angelone,* 176 F.3d 210, 220 (4th Cir.), *cert. denied,* —— U.S. ——, 120 S.Ct. 401, 145 L.Ed.2d 313 (1999).

### 6. Failure to allow individual questioning and sequestration during *voir dire.*

 Helen Briggs was a member of the venire during the jury selection process. When questioned about the death penalty, she stated her opinions were strong and explained her perception of the difference between intending to kill someone and doing so accidently. "But intentionally killing someone is not something that I find easy to treat lightly. And while life in prison is not a light sentence, I worry that someone that's been granted life in prison could come up for parole sometime in the foreseeable future, and I think we have too many repeat offenders on the street." Jury Selection Transcript, at 262. Petitioner argues that had the trial court granted his motion for sequestration, other members of the venire would not have heard this exchange. And, having heard it, Petitioner argues his attorneys should have been entitled to question Ms. Briggs about her opinions concerning parole eligibility in connection with a life sentence. "With individual voir dire one of these jurors *may have voted for life.*" Petition, at 65 (emphasis added).

North Carolina does not require that the jury *voir dire* be conducted individually in all capital cases. *State v. Morganherring,* 350 N.C. 701, 517 S.E.2d 622 (1999) (*petition for cert. filed* Jan. 7, 2000).

> [Petitioner] asserts that the trial court erred in denying his motion for sequestration and individual *voir dire* of prospective jurors. [Petitioner] contends that the jurors waiting to be examined were in the courtroom and heard the statements and preconceived opinions of others then being examined and that this prevented a fair trial.... The decision whether to grant sequestration and individual *voir dire* of prospective jurors [pursuant to N.C. Gen.Stat. § 15A–1214(j) ] rests in the sound discretion of the trial court, and its ruling will not be disturbed absent a showing of an abuse of discretion. In this case, the [Petition-

er] has failed to identify any reasonable grounds upon which the trial court could have determined that there was "good cause" for granting his motion. Thus, we conclude that the trial court did not abuse its discretion . . . .

*State v. Short,* 322 N.C. 783, 788, 370 S.E.2d 351, 354 (1988) (citations omitted). Ms. Briggs opinions about the death penalty and parole eligibility were insufficient reasons to sequester the jurors or to allow individual *voir dire. Id.; accord, State v. Trull,* 349 N.C. 428, 441, 509 S.E.2d 178, 187 (1998), *cert. denied,* —— U.S. ——, 120 S.Ct. 95, 145 L.Ed.2d 80 (1999). Moreover, since the Petitioner would have been eligible for parole after 20 years, additional questioning would have been not only futile, it would have proved the prospective juror's point.

The procedure used by the trial court also passes muster under federal law. *See, United States v. ReBrook,* 58 F.3d 961, 969 (4th Cir.1995); *United States v. Bakker,* 925 F.2d 728, 733–34 (4th Cir. 1991).

### 7. Improper statements of prosecuting attorneys.[9]

██ Petitioner claims that through comments to the jury, the prosecutors intentionally summarized aggravating and mitigating factors in such a way as to shift the burden of proof from the State to the Petitioner. During jury selection, the prosecutor made various statements describing the procedure which would be used during the sentencing phase of the trial. Those statements were similar to the following:

The next step would be a sentencing hearing. There would be several questions the jury would have to answer at that time. First question would deal with aggravating factors or circumstances which the state would present to you. And in my definition, and here again listen to what the judge tells [you]. The aggravating circumstances would be

something in this case the state would be presenting would lean the punishment for this defendant in a first degree murder conviction for a death penalty. The defendant would then be able to put on evidence tending to mitigate the sentence, or present mitigating circumstances, factors to the jury which would tend to bring the ultimate punishment down from the death penalty and would tend to make it a sentence of life imprisonment. . . . At some point if the jury finds aggravating factors, mitigating factors or circumstances, there would be a weighing process. You would weigh according to the law, basically, does the mitigating circumstances fail to outweigh the aggravating circumstances; that would be a question for the jury. . . . And ultimately the last question would be would the aggravating circumstance when taken in conjunction with the mitigating circumstances, and following the law the judge tells you the law will be, are the aggravating circumstance or circumstances substantially sufficient to call for the imposition of the death penalty?

Jury Selection Transcript, at 320–22. During closing arguments, the prosecutor made the following statements:

[B]asically an aggravating circumstance are things and circumstances about this case that make it rise to a level that it is a type of case that is deserving of the death penalty.

Sentencing Transcript, at 87.

Remember the first issue had to find unanimously, and you had to find beyond a reasonable doubt before you could find those things. In this section, mitigating factor, bringing it down from the death penalty. That's what the defendant wants to argue to you, wants you to find. Don't have to be unanimous there.

*Id.,* at 91.

Do you unanimously find beyond a reasonable doubt that mitigating circum-

9. Petitioner attributes the prosecutor with improper statements throughout the trial pro-

cess. They are collectively considered here as to the issue of burden of proof.

stance or circumstances are insufficient to outweigh the aggravating? So let me not confuse you. The first issue, is there any aggravating? I said you find yes. To both of these. Are any mitigating? You've got 59. So find as many as you want. Three; remember I told you [ ] picking a jury, now you have to balance them. Number three's your balance question. I didn't want to confuse you on that. If some of you found yes to all 59 at this weighing session, number three, every one of them is yes, every one you found yes; ... Every one of those will not stack to reach his burden. And outweigh the aggravating circumstances of the State.... And I say number three is a yes, those mitigating circumstances don't outweigh what happened this case. So find every one of them yes, if that's what you think, and I argue to you, you can find every one of them yes, that's still going to be a burden they can't overcome.

*Id.,* at 96–97.

Petitioner argues the comments during *voir dire* gave the jury the impression that if an aggravating factor was found, the presumptive sentence was death. And, he claims, the prosecutor's comments during closing argument improperly told the jury that the Petitioner had the burden of proof as to the third issue.

However, the trial court gave the following instructions to the jury prior to *voir dire:*

After all of the evidence has been presented and after you have listened to arguments of counsel, I will instruct you as to all the law that you are to apply to the evidence in these cases. *It is your duty to apply the law as I will give it to you and not as you think the law is or as you might like it to be.*

Jury Selection Transcript, at 55 (emphasis added).

[I]f the defendant is found guilty of first degree murder, then the Court will conduct a sentencing trial. At that trial the same jury will hear the evidence from the state of aggravating factors, those factors which suggest that the death penalty should be imposed. And then the defendant may present evidence of mitigating factors, that is, those factors which suggest that life imprisonment should be imposed. After that evidence is presented the jury will hear arguments and will receive further instructions from the Court. The Court will instruct you that *at this sentencing trial the burden of proof is still on the state to prove beyond a reasonable doubt three things.* If the state can prove them, it is the duty of the jury to return a verdict recommending the death penalty. And I will sentence the defendant to death. If the state fails to prove one or more of those things, then the duty of the jury is to recommend life imprisonment, and I will sentence the defendant to life imprisonment. These are the three things which the state must prove. First, that one or more aggravating factor or circumstance exist. If proved you go to the next step, but if not proved, then you will recommend life imprisonment. Second, that as to any mitigating factor or factors found by one juror or the jury, that such factor is insufficient or inadequate to outweigh the aggravating factors. If proved, you would go the next step but if not proved, you will recommend life imprisonment. And third, finally you will consider whether or not the aggravating factor or factors when considered with the mitigating factors are sufficiently substantial, that is, significant enough to mandate the imposition of the death penalty. If proved, you will recommend the death penalty. If the state has not so proved, you will recommend the punishment of life imprisonment.

*Id.,* 61–62 (emphasis added). After the presentation of Petitioner's mitigation evidence, the trial court gave the following instructions:

It is now your duty to decide from all the evidence presented in both stages what the facts are. *You must then apply the law which I'm about to give you*

*concerning punishment to those facts. It is absolutely necessary that you understand and apply the law as I give it to you and not as you think it is or as you might like it to be.*

Sentencing Transcript, at 122 (emphasis added).

An aggravating circumstance is a fact or a group of facts which tend to make a specific murder particularly deserving of the maximum punishment prescribed by law. Our law identifies the aggravating circumstances which might justify a sentence of death. Only those circumstances identified by statute may be considered by you as aggravating circumstances.

*Id.,* at 125.

A mitigating circumstance is a fact or group of facts which do not constitute a justification or excuse for a killing or reduce it to a lesser degree of crime than first degree murder, but which may be considered as a[n] extenuating or reducing the moral culpability of the killing or make it less deserving of extreme punishment than other first degree murders. . . . [I]t will be your duty to consider as a mitigating circumstance any aspect of the defendant's character, or record, and any of the circumstances of this murder that the defendant contends is a basis for a sentence less than death, and any circumstance arising from the evidence which you deem to have mitigating value. . . . The defendant has the burden of persuading you that a given mitigating circumstance exist[s] . . . by a preponderance of the evidence, that is, the evidence taken as a whole must satisfy you, not beyond a reasonable doubt, but simply satisfy you that any mitigating circumstance exist[s].

*Id.,* at 129–30.

Issue three reads: do you unanimously find beyond a reasonable doubt that the mitigating circumstance or· circumstances found is or are insufficient to outweigh the aggravating circumstance or circumstances found? If you find from the evidence one or more mitigating circumstance, ·you must weigh the aggravating circumstances against the mitigating circumstances.

*Id.,* at 135–36.

Issue four reads: do you unanimously find beyond a reasonable doubt that the aggravating circumstance . . . is . . . sufficiently substantial to call for the imposition of the death penalty when considered with the mitigating circumstance . . . found by one or more of you? *In deciding this issue you are not to consider the aggravating circumstances standing alone. . . . After weighing the totality of the aggravating and mitigating circumstances each of you must be convinced beyond a reasonable doubt that the imposition of the death penalty is justified and appropriate in this case before you can answer this issue yes.*

*Id.,* at 137 (emphasis added).

*Aggravating circumstances may exist in a particular case and still not be sufficiently substantial to call for the death penalty. Therefore, it is not enough for the State to prove from the evidence beyond a reasonable doubt the existence of one or more aggravating circumstance. It must also prove beyond a reasonable doubt that such aggravating circumstances are sufficiently substantial to call for the death penalty.*

*Id.,* at 138–39 (emphasis added).

The North Carolina Supreme Court concluded that the trial court's accurate instructions precluded any possibility that the jury relied on the prosecutor's statement of the law and found no due process violations.

[A]rguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence, and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law. Argu-

ments of counsel which misstate the law are subject to objection and to correction by the court. This is not to say that prosecutorial misrepresentations may never have a decisive effect on the jury, but only that they are not to be judged as having the same force as an instruction from the court. And the arguments of counsel, like the instructions of the court, must be judged in the context in which they are made.... "[A]lthough the prosecutor argued that in his view the evidence did not sufficiently mitigate [Petitioner's] conduct, he never suggested that the background and character evidence could not be considered." His principal tack was not to contend that background and character were irrelevant, but to urge the jury that despite petitioner's past difficulties, he must accept responsibility for his actions. Indeed, the prosecutor explicitly assumed that petitioner's character evidence was a proper factor in the weighing process, but argued that it was minimal in relation to the aggravating circumstances. *Boyde v. California,* 494 U.S. 370, 384–85, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). "[T]he state may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence." *Buchanan v. Angelone,* 522 U.S. 269, 276, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998). The prosecutor's comments and the trial court's instructions in this case fall squarely within these parameters.

## C. Errors related to the guilt phase.

### 1. Improper closing arguments by the prosecution.

 During closing argument at the guilt phase, the prosecutor implied that Petitioner stabbed the victim several times with a knife in order to force him to divulge the location of the money, intentionally avoiding killing him until Petitioner had found it. The prosecutor described a scene in which Petitioner ransacked

Ralph's house looking for the money while Ralph lay bleeding. Petitioner looked for the money under the mattress of Ralph's bed after using Ralph's pants to wipe blood from his hands. He then went into the kitchen to wash his hands and finally returned to deliver the fatal stab. All the while, the prosecutor argued, Ralph lay there bleeding and suffering. Similar arguments were made at the conclusion of the sentencing phase.[10]

Petitioner claims these arguments were not based on evidence presented during the trial and amounted to nothing more than speculation or personal opinion as to the occurrences of that evening. There was no evidence of how much time elapsed between the infliction of the wounds and the final stabbing, no evidence that the initial wounds would have incapacitated the victim, no evidence that the money was under the mattress and no evidence as to how long the killer was in the home. As a result, Petitioner argues the argument was inflammatory and prejudicial.

On direct appeal, the North Carolina Supreme Court found that prosecutors may create a scenario of the events during closing argument as long as there is sufficient evidence from which those events may be inferred. The Fourth Circuit has a two pronged test for ascertaining whether a prosecutor's comments constitutes misconduct. "Specifically, a [Petitioner] 'must show (1) that the [prosecutor's] remarks were improper and (2) that they "prejudicially affected the defendant's substantial rights so as to deprive [him] of a fair trial." ' " *United States v. Wilson,* 135 F.3d 291, 297 (4th Cir.), *cert. denied,* 523 U.S. 1143, 118 S.Ct. 1852, 140 L.Ed.2d 1101 (1998) (quoting *United States v. Adam,* 70 F.3d 776, 780 (4th Cir.1995) (quoting *United States v. Mitchell,* 1 F.3d 235, 240 (4th Cir.1993))). "[A] prosecutor may argue that the evidence gives rise to an inference, but the suggested inference

10. Because Petitioner raised this issue under the general category of errors related to the

guilt phase of the trial, it is considered here.

must be reasonably drawn from the facts in evidence." *Id.,* at 298. Closing argument is not " 'merely a time for recitation of uncontroverted facts.' " *United States v. Loayza,* 107 F.3d 257, 263 (4th Cir.1997) (quoting *United States v. Francisco,* 35 F.3d 116, 120 (4th Cir.1994)).

The evidence at trial and sentencing showed that Petitioner and Ralph had a relationship beyond that of landlord and tenant. Petitioner referred to Ralph as a friend and Ralph's brother testified that Ralph often let Petitioner's rent go unpaid or allowed him to perform work in lieu thereof. However, for the past few months, Ralph had been trying to evict Petitioner and on the day before his murder, two eviction notices were taped to the trailer doors. Ralph's brother also testified that Ralph was known to carry large sums of money.

There was no sign of a forced entry; yet, the living room furniture was knocked over and the bed clothes on Ralph's bed had been pulled back revealing a blood smear on the mattress. Desk drawers were open and clothes were strewn about the bedroom. Ralph was lying on his back in the living room with a bloody wallet without any money in it between his legs. A pair of khaki pants containing blood consistent with Ralph's was in the bedroom. The kitchen sink contained blood, including the faucet handles. A Derringer .22 caliber pistol lying on the kitchen table had blood on its handle.

Dr. Joseph Vogel testified that the stab wound to Ralph's chest was the cause of death because the scissors penetrated his aorta He also had five other wounds to the neck and chest areas, two of which would have been inflicted by a knife blade or scissors. One penetrated to the bone under the chin but both could have been inflicted before the fatal chest wound. The doctor testified there was no indication that Ralph lost consciousness before his death.

The prosecutors painted a picture of Petitioner entering Ralph's home and demanding his money. When Ralph refused to disclose its location, Petitioner stabbed him and went on a rampage through the house looking for the money. Bloodstains in the sink certainly lead to the inference that Petitioner washed his hands; the bloodstained pants likewise lead to the inference that Petitioner wiped his hands after stabbing Ralph. Their past relationship would certainly cause Ralph to be shocked when Petitioner began stabbing him and the pathologist's report supports a conclusion that Ralph lay bleeding and in pain while Petitioner looked for the money. The comments made by the prosecutors during closing arguments were inferred from these facts. *Loayza,* 107 F.3d at 263 (Comment during closing argument that the defendant, who took the stand, "was trying to 'con' or 'dupe' the jury" not improper.); *Francisco,* 35 F.3d at 120 (Prosecutor's comments during closing argument concerning contents of missing portion of recorded conversations with defendant were permissible inferences of defendant's comments).

Moreover, comments during the sentencing phase of a capital trial of the impact on victims is proper.

Nor did the prosecutor's comments about Charisse and Lacie [the victims] in the closing argument violate the Constitution. The jury had earlier seen a videotape of the murder scene that included the slashed and bloody corpses of Charisse and Lacie. In arguing that Payne deserved the death penalty, the prosecutor sought to remind the jury that Charisse and Lacie were more than just lifeless bodies on a videotape, that they were unique human beings. The prosecutor remarked that Charisse would never again sing a lullaby to her [surviving] son and that Lacie would never attend a high school prom. In my view, these statements were permissible. "Murder is the ultimate act of depersonalization." It transforms a living person with hopes, dreams, and fears into a corpse, thereby taking away all that is special and unique about the person.

The Constitution does not preclude a State from deciding to give some of that back.

*Payne v. Tennessee,* 501 U.S. 808, 832, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (O'Connor, J. concurring) (citations omitted).

## 2. There was insufficient evidence to support a conviction based on premeditation.

 The trial court instructed the jury on two theories of murder: murder during the commission of a felony and murder based on malice, premeditation and deliberation. If the jury had convicted Petitioner of felony murder only, the State would not have been able to argue during the sentencing phase that the robbery was an aggravating factor warranting the death penalty. And, Petitioner argues, there was no evidence of premeditation, only evidence that he intended to rob the victim but "got carried away." Although there was evidence that the two fought, Petitioner claims this is insufficient to prove premeditation. Thus, he is entitled to a new sentencing hearing at which the aggravating factor of robbery is not submitted to the jury.

The Supreme Court of North Carolina found more than sufficient evidence to establish premeditation, noting that Ralph did not provoke the incident yet Petitioner stabbed him repeatedly with a knife reverting to the use of scissors after the knife blade broke from contact with Ralph's chin bone.

Though claims of insufficient evidence are cognizable on collateral review, a federal court's review of such claims is "sharply limited." Federal review of the sufficiency of the evidence to support a state conviction is not meant to consider anew the jury's guilt determination or to replace the state's system of direct appellate review. [This] standard "must be applied with explicit reference to the substance elements of the criminal offense as defined by state law."

*Wilson v. Greene,* 155 F.3d 396, 405–06 (4th Cir.), *cert. denied,* 525 U.S. 1012, 119 S.Ct. 536, 142 L.Ed.2d 441 (1998) (quoting

*Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)) (other citations omitted).

First-degree murder is the unlawful killing of another human being with malice, premeditation, and deliberation. "Premeditation means that the act was thought out beforehand for some length of time, however short; but no particular amount of time is necessary for the mental process of premeditation." ... "Deliberation may occur during a scuffle or a quarrel between the defendant and the victim if the emotions produced by the scuffle or quarrel have not overcome the defendant's faculties and reason."

*State v. Larry,* 345 N.C. 497, 513, 481 S.E.2d 907, 916 (1997) (quoting *State v. Gladden,* 315 N.C. 398, 430, 340 S.E.2d 673, 693 (1986) and *State v. Harden,* 344 N.C. 542, 554–55, 476 S.E.2d 658, 664 (1996)). The evidence here showed that on the day before the murder, Petitioner told Ramseur of a plan to rob the victim in order to get money to use for cocaine. The disarray of the house showed someone had searched for the money. Ralph's wounds showed he had been stabbed numerous times prior to the final stabbing.

Deliberation means that the defendant formed an intent to kill and carried out that intent in a cool state of blood, in furtherance of a fixed design for revenge or other unlawful purpose, and not under the influence of a violent passion, suddenly aroused by some lawful or just cause or legal provocation. Premeditation and deliberation are ordinarily not susceptible to proof by direct evidence and therefore must usually be proven by circumstantial evidence. Circumstances to be considered in determining whether a killing was committed with premeditation and deliberation include the following: (1) want of provocation on the part of the deceased, (2) the conduct and statements of the defendant before and during the killing, (3) threats and declarations of the defendant, (4) ill will or previous difficulty between the parties,

(5) the dealing of lethal blows after the deceased has been felled and rendered helpless, and (6) evidence that the killing was done in a brutal manner.

*State v. Alston,* 341 N.C. 198, 245, 461 S.E.2d 687, 713 (1995) (citations omitted). Ralph clearly did not provoke the robbery although the day before murder, Petitioner tried to get Ramseur to rob Petitioner so that he would not be recognized. After the murder, Petitioner admitted he "got carried away" during the robbery. One of the stab wounds made with the knife went through the victim's chin, causing the knife to break when it hit bone. Thereafter, Petitioner embedded a pair of scissors in Ralph's chest, showing both the dealing of a lethal blow after Ralph was helpless and doing so in a brutal manner. Petitioner knew he was being evicted; indeed, his own expert testified this would have caused Petitioner concern. Petitioner armed himself with a knife, showing he anticipated the need to use deadly force. *Larry,* 345 N.C. at 514, 481 S.E.2d at 916–17. " '[S]ome amount of time, however brief, for thought and deliberation must elapse between each [stabbing].' " *Id.* (quoting *State v. Austin,* 320 N.C. 276, 295, 357 S.E.2d 641, 653 (1987)). Here, Petitioner turned to the use of scissors after the knife blade broke. This is not a case in which " 'no rational trier of fact could have found proof of guilt [of premeditated murder] beyond a· reasonable doubt.' " *Wilson,* 155 F.3d at 406 (quoting *Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

**3. The trial court erred by failing to instruct the jury on a lesser included offense.**

■ Petitioner claims the trial court should have instructed the jury on the lesser included offense of second-degree murder pursuant to *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). The North Carolina Supreme Court held there was no evidence to negate the elements of first degree murder proven by the State and thus, Petitioner was not entitled to such an instruction.

"A defendant is entitled to have a lesser-included offense submitted to the jury only when there is evidence to support that lesser-included offense.... If the State's evidence establishes each and every element of first-degree murder and there is no evidence to negate these elements, it is proper for the trial court to exclude second-degree murder from the jury's consideration."

*State v. Bonnett,* 348 N.C. 417, 438–39, 502 S.E.2d 563, 578 (1998), *cert. denied,* 525 U.S. 1124, 119 S.Ct. 909, 142 L.Ed.2d 907 (1999) (quoting *State v. Flowers,* 347 N.C. 1, 29, 489 S.E.2d 391, 407 (1997)).

"A defendant is not entitled to have the jury instructed as to lesser degrees of the crime simply because the crime charged is murder." Instead, "the Circuit and the Supreme Courts agree that lesser included offense instructions are not required where· ... there is no support for such instructions in the evidence." *Under the rule announced in Beck, "due process requires that a lesser included offense instruction be given only when the evidence warrants such an· instruction."* Therefore, if a defendant has a particular theory of defense, he is constitutionally entitled to an instruction on that theory *if the evidence supports it.*

*Kornahrens v. Evatt,* 66 F.3d 1350, 1354 (4th Cir.1995) (quoting *Hopper v. Evans,* 456 U.S. 605, 611, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982)) (emphasis added) (other citations omitted).

[D]ue process requires an instruction on a lesser-included offense only "if the evidence would permit the jury rationally to find him guilty of the lesser offense and acquit him of the greater." In this case, the question is whether the evidence would have permitted the jury rationally to find [Petitioner] guilty of second-degree murder and to acquit him of both felony murder and premeditated and deliberate murder.

*State v. Williams,* 343 N.C. 345, 363, 471 S.E.2d 379, 389 (1996) (quoting *Beck,* 447 U.S. at 634, 100 S.Ct. 2382).

Petitioner admits the State's evidence showed he was trying to get money for cocaine prior to the murder, that he attempted to enlist Ramseur in his plan to rob Ralph, and that after his arrest, he admitted he had gotten "carried away" during the robbery. Thus, he argues, there was evidence that the killing was not premeditated or deliberate. This argument overlooks the fact that the Petitioner was charged with both felony murder and premeditated murder.

Our legislature has defined felony murder as:

> A murder which shall be ... committed in the perpetration or attempted perpetration of any ... robbery ... or other felony committed or attempted with the use of a deadly weapon shall be deemed to be murder in the first degree....

N.C. Gen.Stat. § 14.17. As this Court has stated, "premeditation and deliberation are not elements of the crime of felony-murder." Thus, the elements necessary to prove felony murder are that the killing took place while the accused was perpetrating or attempting to perpetrate one of the enumerated felonies. "By not requiring the State to prove the elements of murder, the legislature has, in essence, established a *per se* rule of accountability for deaths occurring during the commission of felonies." The felony murder rule was promulgated to deter even accidental killings from occurring during the commission of or attempted commission of a dangerous felony. The rationale of the felony murder rule is

> that one who commits a felony is a bad person with a bad state of mind, and he caused a bad result, so that we should not worry too much about the fact that the fatal result he accomplished was quite different and a good deal worse than the bad result he intended.

*State v. Richardson,* 341 N.C. 658, 666–67, 462 S.E.2d 492, 498 (1995) (quoting *State v. Wall,* 304 N.C. 609, 613, 626, 286 S.E.2d 68, 71, 78 (1982)). Accepting the Petitioner's theory of the case, that he did not intend to kill Ralph but he "got carried away," the only evidence presented was that Petitioner killed Ralph during the commission of the robbery. There was no evidence to the contrary and "[t]hus, the evidence would not have permitted the jury rationally to acquit [Petitioner] of felony murder." *Williams,* 343 N.C. at 363–64, 471 S.E.2d at 389. Petitioner was not entitled to a lesser-included offense instruction.

As to the premeditated murder charge, Petitioner's theory remains the same: he intended to rob Ralph but "got carried away" and murdered him. And, he claims, he was drunk at the time and thus could not form the requisite intent. Officer Steve Mueller of the Hickory Police Department testified that during the investigation, he noted the home was "in disarray." Trial Transcript, at 19. Another investigating officer testified that a struggle had occurred. *Id.,* at 319. Mueller found a knife handle "covered in blood in the living room near the chair at the bedroom entrance." *Id.,* at 19. The knife blade, also covered in blood, was found under a cushion belonging to the easy chair in the living room but which was found on the floor. *Id.,* 21, 28. The .38 revolver was found in the living room behind a "knocked over footstool." *Id.,* 20. At the entrance to the bedroom was a pair of pants with blood smears on them. *Id.,* 36. Clothes were scattered around the bedroom and the desk drawers had been opened. *Id.* The sheets and blankets had been pulled off the bed and the mattress had been pulled back exposing the box springs. *Id.,* at 37. There were blood smears on these as well. *Id.* Dr. Vogle testified Ralph had six separate wounds to his neck and chest region. *Id.,* at 268. There was a wound under the right nipple which was a half inch long with a half inch penetration. *Id.* There was a superficial cut on the left side of his chest. *Id.,* at

269. There was another superficial cut in the mid-portion of his chest. *Id.* He had a one and a half inch long cut on the left side of his neck which penetrated into his muscles. *Id.* And, he had a half inch wide cut under his chin which penetrated through the fat and muscle to the bone underneath the chin. *Id.,* at 270. The knife blade was found in a separate location from the handle, leading to the obvious conclusion that it had broken during one of the stabbings. *Larry,* 345 N.C. at 514, 481 S.E.2d at 916–17 (The fact that Petitioner armed himself with a knife showed he anticipated the use of deadly force.). At some point, Petitioner embedded a pair of scissors in Ralph's chest, showing that he looked for and found another weapon. *Id.* ("[S]ome amount of time, however brief, for thought and deliberation must elapse between each [stabbing]."). That wound penetrated the bone and aorta causing blood to empty into his chest cavities. Trial Transcript, at 282. There was also a superficial wound to Ralph's knee. *Id.,* at 272. In Dr. Vogle's opinion, the neck wounds were inflicted before the chest wound. *Id.,* at 278–79.

Second degree murder is murder done with malice but without premeditation and deliberation. *State v. Thomas,* 350 N.C. 315, 346, 514 S.E.2d 486, 505, *cert. denied,* —— U.S. ——, 120 S.Ct. 503, 145 L.Ed.2d 388 (1999). "In this case, the evidence tended to show that defendant entered [the victim's] home … and attacked him without provocation." *Id.,* at 347, 514 S.E.2d at 506. The victim suffered repeated stab wounds to his body, all but one of which the coroner testified were inflicted while he was still alive. *Id.* This evidence showed premeditation and deliberation. *Id.* There was no evidence presented by the Petitioner and his theory of the case is insufficient to negate premeditation and deliberation. *Id.* (Defendant's testimony denying involvement in the crime is not sufficient alone to negate premeditation and deliberation.). Thus, it was not error to refuse to give the instruction for second-degree murder. *See also, Bonnett,* 348 N.C. at 439, 502 S.E.2d at 578 (Evidence that defendant had been drinking insufficient to warrant lesser-included offense instruction where defendant failed to place anything in evidence showing his intoxication had rendered him incapable of forming requisite intent.); *State v. Gary,* 348 N.C. 510, 524, 501 S.E.2d 57, 67 (1998) ("Evidence of multiple blows to the head [of the victim] with a heavy, blunt object, any one of which blows could have killed the victim, does not, however, in and of itself constitute evidence of a killing in the heat of passion. Defendant presented no evidence to support a heat-of-passion killing, and mere speculation is not sufficient to negate evidence of premeditation and deliberation."); *Larry,* 345 N.C. at 517, 481 S.E.2d at 918 ("*The test in every case involving the propriety of an instruction on a lesser grade of an offense is not whether the jury could convict defendant of the lesser crime,* but whether the State's evidence is positive as to each element of the crime charged and whether there is any conflicting evidence relating to any of these elements.") (emphasis added); *Williams, supra; State v. Britt,* 132 N.C.App. 173, 179, 510 S.E.2d 683, 688 (1999) (Defendant's alibi defense insufficient to negate evidence of premeditation and deliberation.).

## D. Issues related to the sentencing phase of the trial.

### 1. Improper comments during closing arguments by prosecutors.

Petitioner claims that portions of the closing argument violated his constitutional rights in one of three ways: (1) the jury was told by the prosecutor to treat the Petitioner the same as anyone else convicted of first-degree murder would be treated; (2) the jury was told that mercy and sympathy played no part in their determination; and (3) the arguments diminished the jurors' sense of responsibility by advising them to apply the law.

During closing argument, Petitioner's attorney made the following statements to the jury:

As I said you have to answer in your own minds two questions. The first

question is do I really, do I want to kill Ronny Frye? Each of you has to make that personal decision. And second, do I have to kill Ronny Frye? Is it necessary for society or for protection to kill Ronny Frye?

Sentencing Transcript, at 86.

In response, the prosecutor made the following comments during his closing argument:

What's his punishment? The judge will tell you this is not to be based on sympathy, and not to be based on retribution. You feel sorry for the family or you feel sorry for Ronald Frye. You're not to base it on what you think you should do and what you—I believe the way it was told to you, do you want to kill Ronald Frye? I challenge you to go through here and find and see if that question ever arises: if you want to kill Ronald Frye. If that's a standard the State loses every case.... When you decide what that last decision will be, it should (phonetic) be emotional. You should take it, because everybody tried for murder and then goes to phase two should be treated equally. Everybody treated alike. If this jury feels sympathy and lets him go, he's not treated the same. If this jury feels sympathy for the family and says I don't care what the evidence is, let's just get rid of some of this crime, that's not fair, because he's not treated like everybody else. So this isn't an issue of sir, what do you feel?, ma'am, what do you feel? This is to follow the law.... You don't have to struggle with your own emotions oh, did I want to kill him?[,] what a tremendous burden.... Answer these questions one at a time. You're looking at those issues. The way the law asked you to look at them. That's all the State wants you to do. Follow the law. We're not trying to get you all mad and mean, we're saying look at everything.

Id., at 100–01.

The second prosecutor made the following comments during his closing argument:

The defendant does not want to die.... What about Ralph? ... You think he wanted to live? ... Well, [Petitioner] should have thought about that before he stuck the scissors in his chest.... 'Cause Ralph wanted to live. And he had a right to live. And he took it away from him. Now he comes in and says I want to live. Have mercy on me. It's not about mercy. It's about following the law.

Id., at 111.

Petitioner claims these comments caused the jury to fail to look at his case individually, caused them to overlook mitigating factors, allowed them to preclude sympathy or mercy from their consideration of the mitigating factors, and diminished their role by instructing them to follow the law without mercy or compassion.

 The North Carolina Supreme Court found the prosecutors' remarks, when taken in context, reminded the jury to follow the law and not be guided by emotion. It also found that telling a jury that all persons should be treated equally and to follow the law did not diminish their role.

In determining whether a closing argument by a prosecutor violates due process, this court must look to "whether the proceeding at issue was rendered fundamentally unfair by the improper argument." This determination requires the court to look to "the nature of the comments, the nature and quantum of evidence before the jury, the arguments of closing counsel, the judge's charge, and whether the errors were isolated or repeated."

Boyd v. French, 147 F.3d 319, 329 (4th Cir.1998), cert. denied, 525 U.S. 1150, 119 S.Ct. 1050, 143 L.Ed.2d 56 (1999) (quoting Bennett v. Angelone, 92 F.3d 1336, 1345–46 (4th Cir.1996)). The bulk of the prosecutors' remarks were in response to the defense counsel's queries of the jury concerning whether they "wanted to kill" the

Petitioner. As such, they were not improper. *Id.* (citing *United States v. Young,* 470 U.S. 1, 12–13, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) ("explaining that in determining whether prosecutor's improper argument was prejudicial to defendant, reviewing court must consider whether prosecutor's comments were invited response to defense and 'did no more than respond substantially in order to right the scale.' ")). Moreover, advising the jury to answer each interrogatory, consider the mitigating factors and follow the law was in no manner improper. *Bell v. Evatt,* 72 F.3d 421, 436–37 (4th Cir.1995) ("Bell is attempting to extract unconstitutional implications from the State's argument and use them to his advantage. . . . [T]he State's arguments were consistent with the record and were rationally inferred from the abundance of evidence that had been presented at trial."). Nor is it improper to remind a jury of its role and the obligation to follow the law. *State v. Murillo,* 349 N.C. 573, 609, 509 S.E.2d 752, 773 (1998), *cert. denied,* —— U.S. ——, 120 S.Ct. 103, 145 L.Ed.2d 87 (1999). And while the "trial court may not preclude the jury from considering compassion, 'the prosecutor may discourage the jury from having mere sympathy not related to the evidence in the case affect its decision. Such statements are consistent with the prosecutor's role in seeking a recommendation of death.' " *Id.,* at 609, 509 S.E.2d at 773–74 (quoting *State v. Rouse,* 339 N.C. 59, 93, 451 S.E.2d 543, 561 (1994)). The full text of the comments shows that the jury was not told to avoid any emotion but to keep emotion in perspective. Moreover, this jury was told, more than once, that it was to follow the law as charged by the court. *Boyd, supra.*

Petitioner also takes exception to the prosecutor's argument concerning the presence of aggravating versus mitigating factors.

The State is restricted. We can only go by what the statute says we can do, and in this case only two of [the statutory aggravating factors] apply. They can come up with as many [mitigating factors] as they want to. . . . They play a numbers game on you. We'll put 59 of them, and outweigh [their] two. And that's what they tried to do here.

Sentencing Transcript, at 104. The North Carolina Supreme Court found the comments were merely an argument that 59 mitigating factors did not outweigh the two aggravating factors. Again, these comments followed the closing argument of defense counsel in which the mitigating factors were described as outweighing the aggravating factors. Thus, they were proper and not prejudicial. *Boyd, supra; Boyde, supra.* Moreover, assuming *arguendo* that the comments were improper, they did not " 'so infect[ ] the trial with unfairness as to make the resulting [sentence] a denial of due process.' " *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)).

**2. The trial court erred by submitting the lack of a prior criminal history as a mitigating factor.**

■ Under North Carolina's capital punishment statute, one of the mitigating circumstances which may be considered by the jury is the lack of a significant history of prior criminal conduct. N.C. Gen.Stat. § 15A–2000(f)(1). Defense counsel requested the submission of the factor but inquired of the Court whether submission would allow rebuttal evidence by the State. Sentencing Transcript, at 62. The court ruled that it was required under state law to submit the factor and to allow rebuttal evidence. *Id.,* at 63. As a result, the factor was submitted to the jury and the State then presented rebuttal evidence disclosing Petitioner's criminal record which included a 1977 conviction for damaging personal property, a 1980 charge of damaging city property, a 1980 probation revocation, a 1980 conviction for resisting arrest and assault on an officer, a 1982 conviction for felonious breaking and entering and two drug charges in 1987. *Id.,* at 71–76. When the jury deliberated, no

juror found as a mitigating factor that the Petitioner lacked a significant history of prior criminal conduct. Petitioner argues the trial court erroneously concluded it was required to submit the mitigating factor and this error opened the door for the State to introduce rebuttal evidence.

The North Carolina Supreme Court held the trial court was obligated under state law to submit the mitigating factor to the jury because it could not conclude that no rational juror would consider this history insignificant. Petitioner argues that his history was clearly significant based on the number and seriousness of his convictions.

"The trial court has no discretion as to whether to submit statutory mitigating circumstances when evidence is presented in a capital case which may support a statutory circumstance." *State v. Skipper,* 337 N.C. 1, 44, 446 S.E.2d 252, 276 (1994). Here, evidence was presented at both the guilt and punishment phases that Petitioner used illegal drugs and had been incarcerated a number of times. "[W]here evidence is presented in a capital sentencing proceeding that may support a statutory mitigating circumstance, N.C.G.S. § 15A–2000(b) directs that the circumstance must be submitted for the jury's consideration absent defendant's request or even over his objection." *State v. Ingle,* 336 N.C. 617, 642, 445 S.E.2d 880, 893 (1994). Prior criminal activity is significant "if it is 'likely to have influence or effect upon the determination by the jury of its recommended sentence.' 'When the trial court is deciding whether a rational juror could reasonably find this mitigating circumstance to exist, the nature and age of the prior criminal activities are important, and the mere number of criminal activities is not dispositive.' " *State v. Jones,* 346 N.C. 704, 715–16, 487 S.E.2d 714, 721 (1997) (quoting *State v. Walls,* 342 N.C. 1, 56, 463 S.E.2d 738, 767 (1995) and *State v. Geddie,* 345 N.C. 73, 102, 478 S.E.2d 146, 161 (1996)). The murder here occurred in January 1993 and Petitioner had not been charged with any offense since 1987. The 1987 charges were misdemeanors. Most of his convictions were in 1980 and the most serious conviction was in 1982, over ten years prior to the current offense. *Geddie,* 345 N.C. at 102, 478 S.E.2d at 161 (Where defendant's felony convictions occurred ten and fifteen years earlier, court did not err in submitting to the jury defendant's insignificant prior criminal history). Compared to other cases in which the North Carolina courts have allowed the submission, Petitioner's prior criminal history is clearly insignificant. *State v. Billings,* 348 N.C. 169, 189, 500 S.E.2d 423, 435, *cert. denied,* 525 U.S. 1005, 119 S.Ct. 519, 142 L.Ed.2d 431 (1998) (It was not error to submit the mitigating factor where defendant had previously been convicted of attempted second-degree murder and had a history of drug trafficking.); *Jones,* 346 N.C. at 716, 487 S.E.2d at 721 (Defendant's prior history consisted of property thefts.); *State v. Ball,* 344 N.C. 290, 310–11, 474 S.E.2d 345, 357 (1996) (Defendant had a history including drugs, robbery, felonious assault and forgery.); *State v. Rowsey,* 343 N.C. 603, 619–20, 472 S.E.2d 903, 911–12 (1996) (Defendant's history included larceny, injury to property, felonious breaking and entering, drugs and possession of a concealed weapon).

It is a due process violation to refuse to allow the jury to consider in mitigation " 'any aspect of a defendant's character or record and any of the circumstances of the offense *that the defendant proffers* as a basis for a sentence less than death.' " *Delo v. Lashley,* 507 U.S. 272, 275, 113 S.Ct. 1222, 122 L.Ed.2d 620 (1993) (quoting *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)) (emphasis added). Here, Petitioner requested the submission of the factor. In addition, because there was evidence of Petitioner's criminal history, due process required the submission. *Id.* In fact, the "Due Process Clause of the Fourteenth Amendment may require the admission of mitigating evidence even if state-law rules of evidence [ ] would exclude it." *Boyd,* 147 F.3d at 325–26. Thus, failure of the trial court to submit this factor would have been error.

**3. The trial court erred by submitting as an aggravating factor that the murder was heinous.**

 The State argued, and the court submitted, that the jury could consider whether it was an aggravating factor that the murder was especially heinous, atrocious or cruel. Petitioner contends the evidence did not warrant that instruction because "[o]ther than the use of a pair of scissors, the murder was not extraordinary." The North Carolina Supreme Court found to the contrary because of the relationship between Petitioner and his victim and the repeated stabbings.

The trial court charged the jury on this issue as follows:

> Was this murder especially heinous, atrocious and cruel? In this context heinous means extremely wicked or shockingly evil. Atrocious means outrageously wicked and vile. And cruel means designed to inflict a high degree of pain with utter indifference to and even enjoyment of the suffering of others. However, it is not enough that this murder be heinous[,] atrocious or cruel as these terms have just been defined. This murder must have been especially heinous, atrocious or cruel, and not every murder is especially so. For this murder to have been especially heinous[,] atrocious or cruel, any brutality which was involved in it must have exceeded that [which] is normally present in any killing. Or this murder must have been a conscious or pitiless crime which was unnecessarily torturous to the victim.

Sentencing Transcript, at 127–28. Ralph was attacked in the early morning hours after Petitioner, whom he knew well, entered his home. "[M]urder committed in the home particularly 'shocks the conscience' because such murders involve the violation of 'an especially private place, one [where] a person has a right to feel secure.'" *State v. Thomas,* 350 N.C. at 365, 514 S.E.2d at 517 (quoting *State v. Adams,* 347 N.C. 48, 77, 490 S.E.2d 220, 236 (1997)); *Rowsey,* 343 N.C. at 632–33, 472

S.E.2d at 919 (Victim alone in the early morning hours particularly vulnerable.). He was stabbed six times although only the last stabbing would have lead to death in any event. *Id.* (Death was not instantaneous.) He was alive during the stabbings and bleeding into his lungs, thus gasping for breath. *Id.; Thomas, supra* ("[D]efendant repeatedly stabbed the victim while he was [ ] helpless and while he was still conscious."). Thus, the trial court did not err.

**4. The North Carolina instruction on the "especially heinous, atrocious or cruel" aggravating factor is unconstitutionally vague.**

 Petitioner argues that the instruction defining the words heinous, atrocious and cruel are unconstitutionally vague, relying on *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988) and *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). While it is correct that similar definitions were held unconstitutional by the Court in those decisions, "[i]n the twelve years [after] *Godfrey,* the United States Supreme Court has approved certain limiting instructions . . . as constitutionally sufficient, 'provid[ing] *some* guidance to the sentencer.' Approved language includes the phrase 'the conscienceless or pitiless crime which is unnecessarily torturous to the victim.'" *State v. Syriani,* 333 N.C. 350, 389, 428 S.E.2d 118, 139 (1993) (quoting *Walton v. Arizona,* 497 U.S. 639, 654, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) and *Proffitt v. Florida,* 428 U.S. 242, 255, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976)). This language was included in the instruction given. Moreover, the Fourth Circuit has approved an instruction virtually identical to that given here. *Huffstetler v. Dixon,* 28 F.3d 1209 (table), 1994 WL 313630 *4 (4th Cir.1994). This assignment of error is therefore rejected. *See also, State v. McNeil,* 350 N.C. 657, 693, 518 S.E.2d 486, 508 (1999).

**5. The trial court's instruction on mitigation was unconstitutionally narrow.**

Petitioner claims the definition of mitigating factors precluded the jury from considering evidence of his character and record as mitigating. In support of this argument, he notes the court instructed that a "mitigating circumstance is a fact or group of facts which do not constitute a justification or excuse for a killing or reduce it to a lesser degree ... but which may be considered as extenuating or reducing the moral culpability of the killing ...." Sentencing Transcript, at 129. Petitioner's argument, however, is based on a glaring omission of the entire instruction which included the following: "Our law identifies several possible mitigating circumstances. However, in considering issue two it will be your duty *to consider as a mitigating circumstance any aspect of the defendant's character, or record, and any of the circumstances of this murder that the defendant contends is a basis for a sentence less than death, and any circumstances arising from the evidence which you deem to have mitigating value."* *Id.,* at 129 (emphasis added). The argument is therefore rejected.

**6. The trial court's use of the word "may" in connection with mitigation was error.**

For the same reasons as set forth above, the undersigned rejects Petitioner's claim that the word "may" in the instruction was unconstitutional.

**7. The trial court erred in advising the jury of the weighing process.**

Petitioner claims the trial court erroneously instructed the jury that it had a duty to impose the death penalty if it found mitigating factors outweighed by aggravating factors. This, he argues, precluded them from considering mercy and entertaining residual doubt. Again, the totality of the instruction shows the claim is frivolous. The court charged in pertinent part:

After weighing the totality of the aggravating and mitigating circumstances each of you must be convinced *beyond a reasonable doubt* that the imposition of the death penalty is justified and appropriate in this case before you can answer this issue yes.... You must consider the relative substantiality and persuasiveness of existing aggravating and mitigating circumstances in making this determination. You the jury must determine how compelling and persuasive the totality of the aggravating circumstances are when compared with the totality of the mitigating circumstances. After so doing *if you are satisfied beyond a reasonable doubt that the aggravating circumstances found by you are sufficiently substantial to call for the death penalty, when considered with the mitigating circumstances found by one or more of you, it would be your duty to answer the issue yes.* If you are not so satisfied *or have a reasonable doubt, it would be your duty to answer this issue no....* [I]t is not enough for the State to prove from the evidence beyond a reasonable doubt the existence of one or more aggravating circumstances. *It must also prove beyond a reasonable doubt that such aggravating circumstances are sufficiently substantial to call for the death penalty.*

*Id.,* at 137–39 (emphasis added). This argument, as well, is frivolous.

**8. The trial court's instructions on two mitigating factors were erroneous.**

Petitioner's defense counsel requested and were granted the submission of two statutory mitigating factors to the jury; mental or emotional disturbance and impaired capacity. The court gave the following instructions:

You would find this mitigating circumstance [mental or emotional disturbance] if you find that the defendant suffered from paranoid disorder, mixed substance abuse disorder, mixed personality disorder, *and* child abuse syndrome, and that as a result the defendant was under the

influence of mental and/or emotional disturbance when he killed the victim.

*Id.*, at 132 (emphasis added).

You would find this mitigating circumstance [impaired capacity] if you find that the defendant suffered from paranoid disorder, mixed substance disorder, mixed personality disorder and substance abuse syndrome *and* that this impaired his capacity to appreciate the criminality of his conduct *or* to conform his conduct to the requirements of the law.[11]

*Id.*, at 133 (emphasis and footnote added). As a result of the use of the conjunctive, Petitioner argues, the jury was precluded "from considering the full scope of these statutory mitigating circumstances. The plain language of each circumstance meant that a juror's failure to find any one of the factual elements entirely precluded consideration of the circumstance." Petition, at 108.

The jury found both of these statutory mitigating circumstances were proved by a preponderance of the evidence. This alone refutes the contention and it is unnecessary to consider it further.

### IV. ORDER

IT IS, THEREFORE, ORDERED that the Respondent's motion for summary judgement is ALLOWED, and the Petitioner's motion for summary judgment is DENIED.

A Judgment dismissing the Petitioner's petition in its entirety is filed herewith.

---

**11.** In the Petition, counsel argue that the word "or" in the instruction was the word "and." However, the copy of the transcript provided to the Court contained the word "or."